# ARIZONANS FOR OFFICIAL ENGLISH ET AL. *v.* ARIZONA ET AL.

No. 95–974.   Argued December 4, 1996—Decided March 3, 1997

44

46

*Barnaby W. Zall* argued the cause and filed briefs for petitioners.

*Robert J. Pohlman* argued the cause for respondents. With him on the brief for respondent Yniguez was *Brian A. Luscher. Stephen G. Montoya, Albert M. Flores,* and *George Robles Vice III* filed a brief for respondents Arizonans Against Constitutional Tampering et al. *Grant Woods,* Attorney General, *Rebecca White Berch,* First Assistant Attorney General, *C. Tim Delaney,* Solicitor General, *Paula S. Bickett,* Assistant Attorney General, and *Carter G. Phillips* filed briefs for respondents State of Arizona et al.*

---

*Briefs of *amici curiae* urging reversal were filed for the FLA–187 Committee et al. by *Stanley W. Sokolowski;* for the Pacific Legal Foundation by *Sharon L. Browne;* for U. S. English, Inc., by *Leonard J. Henzke, Jr.;* for the Washington Legal Foundation et al. by *Richard K. Willard, Bennett Evan Cooper, Daniel J. Popeo, Richard A. Samp,* and *Don Stenberg;* and for Thurston Greene, *pro se.*

Briefs of *amici curiae* urging affirmance were filed for the State of New Mexico by *Tom Udall,* Attorney General, *Manuel Tijerina,* Deputy Attorney General, and *Gerald T. E. Gonzalez, Tannis L. Fox, Laura Fashing, Elizabeth A. Glenn,* and *William S. Keller,* Assistant Attorneys General; for the American Civil Liberties Union et al. by *Edward M. Chen, Steven R. Shapiro, Marjorie Heins,* and *Robert L. Rusky;* for the Hawaii Civil Rights Commission et al. by *John H. Ishihara, Carl C. Christensen,* and *Eric K. Yamamoto;* for Human Rights Watch by *Allan Blumstein* and *Kenneth Roth;* for the Linguistic Society of America et al. by *Peter M. Tiersma;* for the Mexican American Legal Defense and Educational Fund by *E. Richard Larson;* for the National Council of La Raza et al. by *Joseph N. Onek, William D. Wallace,* and *Javier M. Guzman;* for the Navajo Nation by *Thomas W. Christie;* for the Puerto Rican Legal Defense and Education Fund et al. by *Kenneth Kimerling, Karen K. Narasaki,* and *Richard Albores;* and for Representative Nydia M. Velazquez et al. by *Walter A. Smith, Jr.,* and *Audrey J. Anderson.*

*Acting Solicitor General Dellinger, Assistant Attorney General Hunger, Deputy Solicitor General Kneedler, Deputy Assistant Attorney Gen-*

JUSTICE GINSBURG delivered the opinion of the Court.

Federal courts lack competence to rule definitively on the meaning of state legislation, see, *e. g.*, *Reetz* v. *Bozanich*, 397 U. S. 82, 86–87 (1970), nor may they adjudicate challenges to state measures absent a showing of actual impact on the challenger, see, *e. g.*, *Golden* v. *Zwickler*, 394 U. S. 103, 110 (1969). The Ninth Circuit, in the case at hand, lost sight of these limitations. The initiating plaintiff, Maria-Kelly F. Yniguez, sought federal-court resolution of a novel question: the compatibility with the Federal Constitution of a 1988 amendment to Arizona's Constitution declaring English "the official language of the State of Arizona"—"the language of . . . all government functions and actions." Ariz. Const., Art. XXVIII, §§ 1(1), 1(2). Participants in the federal litigation, proceeding without benefit of the views of the Arizona Supreme Court, expressed diverse opinions on the meaning of the amendment.

Yniguez commenced and maintained her suit as an individual, not as a class representative. A state employee at the time she filed her complaint, Yniguez voluntarily left the State's employ in 1990 and did not allege she would seek to return to a public post. Her departure for a position in the private sector made her claim for prospective relief moot. Nevertheless, the Ninth Circuit held that a plea for nominal damages could be read into Yniguez's complaint to save the case, and therefore pressed on to an ultimate decision. A three-judge panel of the Court of Appeals declared Article XXVIII unconstitutional in 1994, and a divided en banc court, in 1995, adhered to the panel's position.

The Ninth Circuit had no warrant to proceed as it did. The case had lost the essential elements of a justiciable controversy and should not have been retained for adjudication on the merits by the Court of Appeals. We therefore

*eral Preston, Irving L. Gornstein,* and *Anthony J. Steinmeyer* filed a brief for the United States as *amicus curiae.*

vacate the Ninth Circuit's judgment, and remand the case to that court with directions that the action be dismissed by the District Court. We express no view on the correct interpretation of Article XXVIII or on the measure's constitutionality.

## I

A 1988 Arizona ballot initiative established English as the official language of the State. Passed on November 8, 1988, by a margin of one percentage point,[1] the measure became effective on December 5 as Arizona State Constitution Article XXVIII. Among key provisions, the Article declares that, with specified exceptions, the State "shall act in English and in no other language." Ariz. Const., Art. XXVIII, § 3(1)(a). The enumerated exceptions concern compliance with federal laws, participation in certain educational programs, protection of the rights of criminal defendants and crime victims, and protection of public health or safety. *Id.*, § 3(2). In a final provision, Article XXVIII grants standing to any person residing or doing business in the State "to bring suit to enforce th[e] Article" in state court, under such "reasonable limitations" as "[t]he Legislature may enact." *Id.*, § 4.[2]

Federal-court litigation challenging the constitutionality of Article XXVIII commenced two days after the ballot initiative passed. On November 10, 1988, Maria-Kelly F. Yniguez, then an insurance claims manager in the Arizona Department of Administration's Risk Management Division, sued the State of Arizona in the United States District Court for the District of Arizona. Yniguez invoked 42 U.S.C.

---

[1] The measure, opposed by the Governor as "sadly misdirected," App. 38, drew the affirmative votes of 50.5% of Arizonans casting ballots in the election, see *Yniguez* v. *Arizonans for Official English*, 69 F. 3d 920, 924 (CA9 1995).

[2] Article XXVIII, titled "English as the Official Language," is set out in full in an appendix to this opinion.

§ 1983 as the basis for her suit.[3]    Soon after the lawsuit commenced, Yniguez added as defendants, in their individual and official capacities, Arizona Governor Rose Mofford, Arizona Attorney General Robert K. Corbin, and the Director of Arizona's Department of Administration, Catherine Eden. Yniguez brought suit as an individual and never sought designation as a class representative.

Fluent in English and Spanish, Yniguez was engaged primarily in handling medical malpractice claims against the State.   In her daily service to the public, she spoke English to persons who spoke only that language, Spanish to persons who spoke only that language, and a combination of English and Spanish to persons able to communicate in both languages.   Record, Doc. No. 62, ¶¶ 8, 13 (Statement of Stipulated Facts, filed Feb. 9, 1989).   Yniguez feared that Article XXVIII's instruction to "act in English," § 3(1)(a), if read broadly, would govern her job performance "every time she [did] something."   See Record, Doc. No. 62, ¶ 10.   She believed she would lose her job or face other sanctions if she did not immediately refrain from speaking Spanish while serving the State.   See App. 58, ¶ 19 (Second Amended Complaint).   Yniguez asserted that Article XXVIII violated the First and Fourteenth Amendments to the United States Constitution and Title VI of the Civil Rights Act of 1964, 78 Stat. 252, 42 U. S. C. § 2000d.   She requested injunctive and declaratory relief, counsel fees, and "all other relief that the

---

[3] Derived from § 1 of the Civil Rights Act of 1871, Rev. Stat. § 1979, 42 U. S. C. § 1983 provides in relevant part:

*"Civil action for deprivation of rights.*

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Court deems just and proper under the circumstances." App. 60.

All defendants named in Yniguez's complaint moved to dismiss all claims asserted against them.[4] The State of Arizona asserted immunity from suit under the Eleventh Amendment. The individual defendants asserted the absence of a case or controversy because "none of [them] ha[d] threatened [Yniguez] concerning her use of Spanish in the performance of her job duties [or had] ever told her not to use Spanish [at work]." Record, Doc. No. 30, p. 1. The defendants further urged that novel state-law questions concerning the meaning and application of Article XXVIII should be tendered first to the state courts. See *id.*, at 2.[5]

Trial on the merits of Yniguez's complaint, the parties agreed, would be combined with the hearing on her motion for a preliminary injunction.[6] Before the trial occurred, the State Attorney General, on January 24, 1989, released an opinion, No. I89–009, construing Article XXVIII and explaining why he found the measure constitutional. App. 61–76.

---

[4] Under Arizona law, the State Attorney General represents the State in federal court. See Ariz. Rev. Stat. Ann. § 41–193(A)(3) (1992). Throughout these proceedings, the State and all state officials have been represented by the State Attorney General, or law department members under his supervision. See § 41–192(A).

[5] Arizona law permits the State's highest court to "answer questions of law certified to it by the supreme court of the United States, a court of appeals of the United States, a United States district court or a tribal court . . . if there are involved in any proceedings before the certifying court questions of [Arizona law] which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the supreme court and the intermediate appellate courts of this state." Ariz. Rev. Stat. Ann. § 12–1861 (1994).

[6] The District Court, on December 8, 1988, had denied Yniguez's application for a temporary restraining order, finding no "imminent danger of the imposition of sanctions" against her. Record, Doc. No. 23, p. 1.

In Opinion No. I89–009, the Attorney General said it was his obligation to read Article XXVIII "as a whole," in line "with the other portions of the Arizona Constitution" and "with the United States Constitution and federal laws." ·App. 61. While Article XXVIII requires the performance of "official acts of government" in English, it was the Attorney General's view that government employees remained free to use other languages "to facilitate the delivery of governmental services." *Id.*, at 62. Construction of the word "act," as used in Article XXVIII, to mean more than an "official ac[t] of government," the Attorney General asserted, "would raise serious questions" of compatibility with federal and state equal protection guarantees and federal civil rights legislation. *Id.*, at 65–66.[7]

On February 9, 1989, two weeks after release of the Attorney General's opinion, the parties filed a statement of stipulated facts, which reported Governor Mofford's opposition to the ballot initiative, her intention nevertheless "to comply with Article XXVIII," and her expectation that "State service employees [would] comply" with the measure. See Record, Doc. No. 62, ¶¶ 35, 36, 39. The stipulation confirmed the view of all parties that "[t]he efficient operation [and administration] of the State is enhanced by permitting State service employees to communicate with citizens of the State in languages other than English where the citizens are not proficient in English." *Id.*, ¶¶ 16, 17. In particular, the parties recognized that "Yniguez'[s] use of a language other

---

[7] Specifically addressing "[t]he handling of customer inquiries or complaints involving state or local government services," the Attorney General elaborated:

"All official documents that are governmental acts must be in English, but translation services and accommodating communications are permissible, and may be required if reasonably necessary to the fair and effective delivery of services, or required by specific federal regulation. Communications between elected and other governmental employees with the public at large may be in a language other than English on the same principles." App. 74.

than English in the course of her performing government business contributes to the efficient operation . . . and . . . administration of the State." *Id.,* ¶ 15. The stipulation referred to the Attorney General's January 24, 1989, opinion, *id.,* ¶ 46, and further recounted that since the passage of Article XXVIII, "none of [Yniguez's] supervisors ha[d] ever told her to change or cease her prior use of Spanish in the performance of her duties," *id.,* ¶ 48.[8]

The District Court heard testimony on two days in February and April 1989, and disposed of the case in an opinion and judgment filed February 6, 1990. *Yniguez* v. *Mofford,* 730 F. Supp. 309. Prior to that final decision, the court had dismissed the State of Arizona as a defendant, accepting the State's plea of Eleventh Amendment immunity. See *id.,* at 311. Yniguez's second amended complaint, filed February 23, 1989, accordingly named as defendants only the Governor, the Attorney General, and the Director of the Department of Administration. See App. 55.[9]

The District Court determined first that, among the named defendants, only the Governor, in her official capacity, was a proper party. The Attorney General, the District Court found, had no authority under Arizona law to enforce provisions like Article XXVIII against state employees. 730 F. Supp., at 311–312. The Director and the Governor,

---

[8] Supplementing their pleas to dismiss for want of a case or controversy, the defendants urged that Attorney General Opinion No. I89–009 "puts to rest any claim that [Yniguez] will be penalized by the State for using Spanish in her work." Record, Doc. No. 51, p. 4, n. 1.

[9] The second amended complaint added another plaintiff, Arizona State Senator Jaime Gutierrez. Senator Gutierrez alleged that Article XXVIII interfered with his rights to communicate freely with persons, including residents of his Senate district, who spoke languages other than English. App. 58–59. The District Court dismissed Gutierrez's claim on the ground that the defendants, all executive branch officials, lacked authority to take enforcement action against elected legislative branch officials. *Yniguez* v. *Mofford,* 730 F. Supp. 309, 311 (Ariz. 1990). Gutierrez is no longer a participant in these proceedings.

on the other hand, did have authority to enforce state laws and rules against state service employees. *Id.*, at 311. But nothing in the record, the District Court said, showed that the Director had undertaken or threatened to undertake any action adverse to Yniguez. *Id.*, at 313. That left Governor Mofford.

The Attorney General "ha[d] formally interpreted Article XXVIII as not imposing any restrictions on Yniguez's continued use of Spanish during the course of her official duties," *id.*, at 312, and indeed all three named defendants—Mofford as well as Corbin and Eden, see *supra*, at 50—"ha[d] stated on the record that Yniguez may continue to speak Spanish without fear of official retribution." 730 F. Supp., at 312. Governor Mofford therefore reiterated that Yniguez faced no actual or threatened injury attributable to any Arizona executive branch officer, and hence presented no genuine case or controversy. See *ibid.* But the District Court singled out the stipulations that "Governor Mofford intends to comply with Article XXVIII," and "expects State service employees to comply with Article XXVIII." Record, Doc. No. 62, ¶¶ 35, 36; see 730 F. Supp., at 312. If Yniguez proved right and the Governor wrong about the breadth of Article XXVIII, the District Court concluded, then Yniguez would be vulnerable to the Governor's pledge to enforce compliance with the Article. See *ibid.*

Proceeding to the merits, the District Court found Article XXVIII fatally overbroad. The measure, as the District Court read it, was not merely a direction that all official acts be in English, as the Attorney General's opinion maintained; instead, according to the District Court, Article XXVIII imposed a sweeping ban on the use of any language other than English by all of Arizona officialdom, with only limited exceptions. *Id.*, at 314. The District Court adverted to the Attorney General's confining construction, but found it unpersuasive. Opinion No. I89–009, the District Court observed, is "merely . . . advisory," not binding on any

court. 730 F. Supp., at 315. "More importantly," the District Court concluded, "the Attorney General's interpretation . . . is simply at odds with Article XXVIII's plain language." *Ibid.*

The view that Article XXVIII's text left no room for a moderate and restrained interpretation led the District Court to decline "to allow the Arizona courts the initial opportunity to determine the scope of Article XXVIII." *Id.*, at 316. The District Court ultimately dismissed all parties save Yniguez and Governor Mofford in her official capacity, then declared Article XXVIII unconstitutional as violative of the First and Fourteenth Amendments, but denied Yniguez's request for an injunction because "she ha[d] not established an enforcement threat sufficient to warrant [such] relief." *Id.*, at 316–317.

Postjudgment motions followed, sparked by Governor Mofford's announcement that she would not pursue an appeal. See App. 98. The Attorney General renewed his request to certify the pivotal state-law question—the correct construction of Article XXVIII—to the Arizona Supreme Court. See Record, Doc. No. 82. He also moved to intervene on behalf of the State, pursuant to 28 U. S. C. § 2403(b),[10] in order to contest on appeal the District Court's declaration that a provision of Arizona's Constitution violated the Federal Constitution. Record, Doc. Nos. 92, 93.

_____

[10] Title 28 U. S. C. § 2403(b) provides:

"In any action, suit, or proceeding in a court of the United States to which a State or any agency, officer, or employee thereof is not a party, wherein the constitutionality of any statute of that State affecting the public interest is drawn in question, the court shall certify such fact to the attorney general of the State, and shall permit the State to intervene for presentation of evidence, if evidence is otherwise admissible in the case, and for argument on the question of constitutionality. The State shall, subject to the applicable provisions of law, have all the rights of a party and be subject to all liabilities of a party as to court costs to the extent necessary for a proper presentation of the facts and law relating to the question of constitutionality."

Two newcomers also appeared in the District Court after judgment: the Arizonans for Official English Committee (AOE) and Robert D. Park, Chairman of AOE. Invoking Rule 24 of the Federal Rules of Civil Procedure, AOE and Park moved to intervene as defendants in order to urge on appeal the constitutionality of Article XXVIII. App. 94–102. AOE, an unincorporated association, was principal sponsor of the ballot initiative that became Article XXVIII. AOE and Park alleged in support of their intervention motion the interest of AOE members in enforcement of Article XXVIII and Governor Mofford's unwillingness to defend the measure on appeal. Responding to the AOE/Park motion, Governor Mofford confirmed that she did not wish to appeal, but would have no objection to the Attorney General's intervention to pursue an appeal as the State's representative, or to the pursuit of an appeal by any other party. See Record, Doc. No. 94.

Yniguez expressed reservations about proceeding further. "She ha[d] won [her] suit against her employer" and had "obtained her relief," her counsel noted. Record, Doc. No. 114, p. 18 (Tr. of Proceeding on Motion to Intervene and Motion to Alter or Amend Judgment, Mar. 26, 1990). If the litigation "goes forward," Yniguez's counsel told the District Court, "I guess we do, too," but, counsel added, it might be in Yniguez's "best interest . . . if we stopped it right here." *Ibid.* The District Court agreed.

In an opinion filed April 3, 1990, the District Court denied all three postjudgment motions. *Yniguez* v. *Mofford,* 130 F. R. D. 410. Certification was inappropriate, the District Court ruled, in light of the court's prior rejection of the Attorney General's narrow reading of Article XXVIII. See *id.,* at 412. As to the Attorney General's intervention application, the District Court observed that §2403(b) addresses only actions "'to which the State or any agency, officer, or employee thereof is not a party.'" See *id.,* at 413 (quoting §2403(b)). Yniguez's action did not fit the §2403(b) de-

scription, the District Court said, because the State and its officers were the very defendants—the sole defendants—Yniguez's complaint named. Governor Mofford remained a party throughout the District Court proceedings. If the State lost ·the opportunity to defend the constitutionality of Article XXVIII on appeal, the District Court reasoned, it was "only because Governor Mofford determine[d] that the state's sovereign interests would be best served by foregoing an appeal." *Ibid.*

Turning to the AOE/Park intervention motion, the District Court observed first that the movants had failed to file a pleading "setting forth the[ir] claim or defense," as required by Rule 24(c). *Ibid.* But that deficiency was not critical, the District Court said. *Ibid.* The insurmountable hurdle was Article III standing. The labor and resources AOE spent to promote the ballot initiative did not suffice to establish standing to sue or defend in a federal tribunal, the District Court held. *Id.*, at 414–415. Nor did Park or any other AOE member qualify for party status, the District Court ruled, for the interests of voters who favored the initiative were too general to meet traditional standing criteria. *Id.*, at ·415.

In addition, the District Court was satisfied that AOE and Park could not tenably assert practical impairment of their interests stemming from the precedential force of the decision. As nonparticipants in the federal litigation, they would face no issue preclusion. And a lower federal-court judgment is not binding on state courts, the District Court noted. Thus, AOE and Park would not be precluded by the federal declaration from pursuing "any future state court proceeding [based on] Article XXVIII." *Id.*, at 415–416.

## II

The Ninth Circuit viewed the matter of standing to appeal differently. In an opinion released July 19, 1991, *Yniguez* v. *Arizona,* 939 F. 2d 727, the Court of Appeals reached these

conclusions: AOE and Park met Article III requirements and could proceed as appellants; Arizona's Attorney General, however, having successfully moved in the District Court for his dismissal as a defendant, could not reenter as a party, but would be permitted to present argument regarding the constitutionality of Article XXVIII. *Id.*, at 738–740. The Ninth Circuit reported it would retain jurisdiction over the District Court's decision on the merits, *id.*, at 740, but did not then address the question whether Article XXVIII's meaning should be certified for definitive resolution by the Arizona Supreme Court.

Concerning AOE's standing, the Court of Appeals reasoned that the Arizona Legislature would have standing to defend the constitutionality of a state statute; by analogy, the Ninth Circuit maintained, AOE, as principal sponsor of the ballot initiative, qualified to defend Article XXVIII on appeal. *Id.*, at 732–733; see also *id.*, at 734, n. 5 ("[W]e hold that AOE has standing in the same way that a legislature might."). AOE Chairman Park also had standing to appeal, according to the Ninth Circuit, because Yniguez "could have had a reasonable expectation that Park (and possibly AOE as well) would bring an enforcement action against her" under §4 of Article XXVIII, which authorizes any person residing in Arizona to sue in state court to enforce the Article. *Id.*, at 734, and n. 5.[11]

---

[11] In a remarkable passage, the Ninth Circuit addressed Yniguez's argument, opposing intervention by AOE and Park, that the District Court's judgment was no impediment to any state-court proceeding AOE and Park might wish to bring, because that judgment is not a binding precedent on Arizona's judiciary. See 939 F. 2d, at 735–736. The Court of Appeals questioned the wisdom of the view expressed "in the academic literature," "by some state courts," and by "several individual justices" that state courts are "coordinate and coequal with the lower federal courts on matters of federal law." *Id.*, at 736 (footnote omitted). The Ninth Circuit acknowledged "there may be valid reasons not to bind the state courts to a decision of a single federal district judge—which is not even binding on the same judge in a subsequent action." *Id.*, at 736–737. However, the appellate panel added, those reasons "are inapplicable to

the Ninth Circuit, explicitly, the issue of nominal damages. *Id.*, at 647, and n. 2.[15]

In line with the Ninth Circuit's instructions, the case file was returned to the District Court on November 5, 1992; AOE and Park filed their second notice of appeal on December 3, App. 206–208, and Yniguez cross-appealed on December 15, App. 209.[16] The Ninth Circuit heard argument on the merits on May 3, 1994. After argument, on June 21, 1994, the Ninth Circuit allowed Arizonans Against Constitutional Tampering (AACT) and Thomas Espinosa, Chairman of AACT, to intervene as plaintiffs-appellees. App. 14; *Yniguez* v. *Arizona,* 42 F. 3d 1217, 1223–1224 (1994) (amended Jan. 17, 1995). AACT was the principal opponent of the ballot initiative that became Article XXVIII. *Id.*, at 1224. In permitting this late intervention, the Court of Appeals noted that "it d[id] not rely on [AACT's] standing as a party." *Ibid.* The standing of the preargument participants, in the Ninth Circuit's view, sufficed to support a determination on the merits. See *ibid.*

In December 1994, the Ninth Circuit panel that had superintended the case since 1990 affirmed the judgment declaring Article XXVIII unconstitutional and remanded the case, directing the District Court to award Yniguez nominal dam-

---

[15] The Ninth Circuit made two further suggestions in the event that Yniguez failed to seek nominal damages: A new plaintiff "whose claim against the operation of the English only provision is not moot" might intervene; or Yniguez herself might have standing to remain a suitor if she could show that others had refrained from challenging the English-only provision in reliance on her suit. See 975 F. 2d, at 647–648. No state employee later intervened to substitute for Yniguez, nor did Yniguez endeavor to show that others had not sued because they had relied on her suit.

[16] On March 16, 1993, the District Court awarded Yniguez nearly $100,000 in attorney's fees. Record, Doc. No. 127. Governor Mofford and the State filed a notice of appeal from that award on April 8, 1993. Record, Doc. No. 128. Because the Ninth Circuit ultimately affirmed the District Court's judgment on the merits, the appeals court did not reach the state defendants' appeal from the award of fees. 69 F. 3d, at 924, n. 2, 927.

ages. 42 F. 3d 1217 (amended Jan. 17, 1995). Despite the Court of Appeals' July 1991 denial of party status to Arizona, the Ninth Circuit apparently viewed the State as the defendant responsible for any damages, for it noted: "The State of Arizona expressly waived its right to assert the Eleventh Amendment as a defense to the award of nominal damages." *Id.*, at 1243. The Ninth Circuit agreed to rehear the case en banc, 53 F. 3d 1084 (1995), and in October 1995, by a 6-to-5 vote, the en banc court reinstated the panel opinion with minor alterations. 69 F. 3d 920.

Adopting the District Court's construction of Article XXVIII, the en banc court read the provision to prohibit

> " 'the use of any language other than English by all officers and employees of all political subdivisions in Arizona while performing their official duties, save to the extent that they may be allowed to use a foreign language by the limited exceptions contained in § 3(2) of Article XXVIII.' " 69 F. 3d, at 928 (quoting 730 F. Supp., at 314).

Because the court found the "plain language" dispositive, 69 F. 3d, at 929, it rejected the State Attorney General's limiting construction and declined to certify the matter to the Arizona Supreme Court, *id.*, at 929–931. As an additional reason for its refusal to grant the Attorney General's request for certification, the en banc court stated: "The Attorney General . . . never conceded that [Article XXVIII] would be unconstitutional if construed as Yniguez asserts it properly should be." *Id.*, at 931, and n. 14.[17] The Ninth Circuit also pointed to a state-court challenge to the constitutionality of

---

[17] The Court of Appeals contrasted *Virginia* v. *American Booksellers Assn., Inc.*, 484 U. S. 383 (1988), in which this Court certified to the Virginia Supreme Court questions concerning the proper interpretation of a state statute. In *American Booksellers*, the Ninth Circuit noted, "the State Attorney General *conceded* [the statute] would be unconstitutional if construed as the plaintiffs contended it should be." 69 F. 3d, at 930.

Article XXVIII, *Ruiz* v. *State*, No. CV92–19603 (Sup. Ct. Maricopa County, Jan. 24, 1994). In *Ruiz*, the Ninth Circuit observed, the state court of first instance "dispos[ed] of [the] First Amendment challenge in three paragraphs" and "d[id] nothing to narrow [the provision]." 69 F. 3d, at 931.[18]

After construing Article XXVIII as sweeping in scope, the en banc Court of Appeals condemned the provision as manifestly overbroad, trenching untenably on speech rights of Arizona officials and public employees. See *id.*, at 931–948. For prevailing in the § 1983 action, the court ultimately announced, Yniguez was "entitled to nominal damages." *Id.*, at 949. On remand, the District Court followed the en banc Court of Appeals' order and, on November 3, 1995, awarded Yniguez $1 in damages. App. 211.

AOE and Park petitioned this Court for a writ of certiorari to the Ninth Circuit.[19] They raised two questions: (1) Does Article XXVIII violate the Free Speech Clause of the First

[18] The *Ruiz* case included among its several plaintiffs four elected officials and five state employees. After defeat in the court of first instance, the *Ruiz* plaintiffs prevailed in the Arizona Court of Appeals. *Ruiz* v. *Symington*, No. 1 CA–CV 94–0235, 1996 WL 309512 (Ariz. App., June 11, 1996). That court noted, with evident concern, that "the Ninth Circuit refused to abstain and certify the question of Article [XXVIII]'s proper interpretation to the Arizona Supreme Court, although the issue was pending in our state court system." *Id.*, at *4. "Comity," the Arizona intermediate appellate court observed, "typically applies when a federal court finds that deference to a state court, on an issue of state law, is proper." *Ibid.* Nevertheless, in the interest of uniformity and to discourage forum shopping, the Arizona appeals court decided to defer to the federal litigation, forgoing independent analysis. *Ibid.* The Arizona Supreme Court granted review in *Ruiz* in November 1996, and stayed proceedings pending our decision in this case. App. to Supplemental Brief for Petitioners 1.

[19] The State did not oppose the petition and, in its Appearance Form, filed in this Court on January 10, 1996, noted that "if the Court grants the Petition and reverses the lower court's decision . . . Arizona will seek reversal of award of attorney's fees against the State." See *supra*, at 61, n. 16.

Amendment by "declaring English the official language of the State and requiring English to be used to perform official acts"?; (2) Do public employees have "a Free Speech right to disregard the [State's] official language" and perform official actions in a language other than English? This Court granted the petition and requested the parties to brief as threshold matters (1) the standing of AOE and Park to proceed in this action as defending parties, and (2) Yniguez's continuing satisfaction of the case-or-controversy requirement. 517 U. S. 1102 (1996).

## III

Article III, § 2, of the Constitution confines federal courts to the decision of "Cases" or "Controversies." Standing to sue or defend is an aspect of the case-or-controversy requirement. *Northeastern Fla. Chapter, Associated Gen. Contractors of America* v. *Jacksonville*, 508 U. S. 656, 663–664 (1993) (standing to sue); *Diamond* v. *Charles*, 476 U. S. 54, 56 (1986) (standing to defend on appeal). To qualify as a party with standing to litigate, a person must show, first and foremost, "an invasion of a legally protected interest" that is "concrete and particularized" and " 'actual or imminent.' " *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560 (1992) (quoting *Whitmore* v. *Arkansas*, 495 U. S. 149, 155 (1990)). An interest shared generally with the public at large in the proper application of the Constitution and laws will not do. See *Defenders of Wildlife*, 504 U. S., at 573–576. Standing to defend on appeal in the place of an original defendant, no less than standing to sue, demands that the litigant possess "a direct stake in the outcome." *Diamond*, 476 U. S., at 62 (quoting *Sierra Club* v. *Morton*, 405 U. S. 727, 740 (1972) (internal quotation marks omitted)).

The standing Article III requires must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance. *Diamond*, 476 U. S., at 62. The decision to seek review "is not to be placed in the

hands of 'concerned bystanders,'" persons who would seize it "as a 'vehicle for the vindication of value interests.'" *Ibid.* (citation omitted).  An intervenor cannot step into the shoes of the original party unless the intervenor independently "fulfills the requirements of Article III." *Id.*, at 68.

In granting the petition for a writ of certiorari in this case, we called for briefing on the question whether AOE and Park have standing, consonant with Article III of the Federal Constitution, to defend in federal court the constitutionality of Arizona Constitution Article XXVIII.  Petitioners argue primarily that, as initiative proponents, they have a quasi-legislative interest in defending the constitutionality of the measure they successfully sponsored.  AOE and Park stress the funds and effort they expended to achieve adoption of Article XXVIII.  We have recognized that state legislators have standing to contest a decision holding a state statute unconstitutional if state law authorizes legislators to represent the State's interests.  See *Karcher* v. *May*, 484 U. S. 72, 82 (1987).[20]  AOE and its members, however, are not elected representatives, and we are aware of no Arizona law appointing initiative sponsors as agents of the people of Arizona to defend, in lieu of public officials, the constitutionality of initiatives made law of the State.  Nor has this Court ever identified initiative proponents as Article-III-qualified defenders of the measures they advocated.  Cf. *Don't Bankrupt Washington Committee* v. *Continental Ill. Nat. Bank & Trust Co. of Chicago*, 460 U. S. 1077 (1983) (summarily dismissing, for lack of standing, appeal by an initiative proponent from a decision holding the initiative unconstitutional).

AOE also asserts representational or associational standing.  An association has standing to sue or defend in such

[20] Cf. *INS* v. *Chadha*, 462 U. S. 919, 930, n. 5, 939–940 (1983) (Immigration and Naturalization Service appealed Court of Appeals ruling to this Court but declined to defend constitutionality of one-House veto provision; Court held Congress a proper party to defend measure's validity where both Houses, by resolution, had authorized intervention in the lawsuit).

capacity, however, only if its members would have standing in their own right. See *Food and Commercial Workers* v. *Brown Group, Inc.*, 517 U. S. 544, 551–553 (1996); *Hunt* v. *Washington State Apple Advertising Comm'n*, 432 U. S. 333, 343 (1977). The requisite concrete injury to AOE members is not apparent. As nonparties in the District Court, AOE's members were not bound by the judgment for Yniguez. That judgment had slim precedential effect, see *supra*, at 58–59, n. 11,[21] and it left AOE entirely free to invoke Article XXVIII, § 4, the citizen suit provision, in state court, where AOE could pursue whatever relief state law authorized. Nor do we discern anything flowing from Article XXVIII's citizen suit provision—which authorizes suits to enforce Article XXVIII in state court—that could support standing for Arizona residents in general, or AOE in particular, to defend the Article's constitutionality in federal court.

We thus have grave doubts whether AOE and Park have standing under Article III to pursue appellate review. Nevertheless, we need not definitively resolve the issue. Rather, we will follow a path we have taken before and inquire, as a primary matter, whether originating plaintiff Yniguez still has a case to pursue. See *Burke* v. *Barnes*, 479 U. S. 361, 363, 364, n. (1987) (leaving unresolved question of congressional standing because Court determined case was moot). For purposes of that inquiry, we will assume, *arguendo*, that AOE and Park had standing to place this case before an appellate tribunal. See *id.*, at 366 (STEVENS, J., dissenting) (Court properly assumed standing, even though that matter raised a serious question, in order to analyze mootness issue). We may resolve the question whether

---

[21] As the District Court observed, the *stare decisis* effect of that court's ruling was distinctly limited. The judgment was "not binding on the Arizona state courts [and did] not foreclose any rights of [AOE] or Park in any future state-court proceeding arising out of Article XXVIII." *Yniguez* v. *Mofford*, 130 F. R. D. 410, 416 (D. Ariz. 1990).

there remains a live case or controversy with respect to Yniguez's claim without first determining whether AOE or Park has standing to appeal because the former question, like the latter, goes to the Article III jurisdiction of this Court and the courts below, not to the merits of the case. Cf. *U. S. Bancorp Mortgage Co.* v. *Bonner Mall Partnership*, 513 U. S. 18, 20–22 (1994).

## IV

To qualify as a case fit for federal-court adjudication, "an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Preiser* v. *Newkirk*, 422 U. S. 395, 401 (1975) (quoting *Steffel* v. *Thompson*, 415 U. S. 452, 459, n. 10 (1974)) (internal quotation marks omitted). As a state employee subject to Article XXVIII, Yniguez had a viable claim at the outset of the litigation in late 1988. We need not consider whether her case lost vitality in January 1989 when the Attorney General released Opinion No. I89–009. That opinion construed Article XXVIII to require the expression of "official acts" in English, but to leave government employees free to use other languages "if reasonably necessary to the fair and effective delivery of services" to the public. See App. 71, 74; *supra*, at 52–53, 54; see also *Marston's Inc.* v. *Roman Catholic Church of Phoenix*, 132 Ariz. 90, 94, 644 P. 2d 244, 248 (1982) ("Attorney General opinions are advisory only and are not binding on the court. . . . This does not mean, however, that citizens may not rely in good faith on Attorney General opinions until the courts have spoken."). Yniguez left her state job in April 1990 to take up employment in the private sector, where her speech was not governed by Article XXVIII. At that point, it became plain that she lacked a still vital claim for prospective relief. Cf. *Boyle* v. *Landry*, 401 U. S. 77, 78, 80–81 (1971) (prospective relief denied where plaintiffs failed to show challenged measures adversely affected any plaintiff's primary conduct).

The Attorney General suggested mootness,[22] but Yniguez resisted, and the Ninth Circuit adopted her proposed method of saving the case. See *supra*, at 60–61.[23] It was not dispositive, the court said, that Yniguez "may no longer be affected by the English only provision," 975 F. 2d, at 647, for Yniguez had raised in response to the mootness suggestion "[t]he possibility that [she] may seek nominal damages," *ibid.*; see App. 197–200 (Appellee Yniguez's Response Regarding Mootness Considerations). At that stage of the litigation, however, Yniguez's plea for nominal damages was not the possibility the Ninth Circuit imagined.

Yniguez's complaint rested on 42 U. S. C. § 1983. See *supra*, at 49–50, and n. 3. Although Governor Mofford in her official capacity was the sole defendant against whom the

---

[22] Mootness has been described as "'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" *United States Parole Comm'n* v. *Geraghty*, 445 U. S. 388, 397 (1980) (quoting Monaghan, Constitutional Adjudication: The Who and When, 82 Yale L. J. 1363, 1384 (1973)).

[23] Yniguez's counsel did not inform the Court of Appeals of Yniguez's departure from government employment, a departure effective April 25, 1990, the day before the appeal was docketed. See App. 7. It was not until September 1991 that the State's Attorney General notified the Ninth Circuit of the plaintiff's changed circumstances. See *id.*, at 187. Yniguez's counsel offered a laconic explanation for this lapse: First, "legal research disclosed that this case was not moot"; second, counsel for the State of Arizona knew of the resignation and "agreed this appeal should proceed." App. 196, n. 2 (Appellee Yniguez's Response Regarding Mootness Considerations). The explanation was unsatisfactory. It is the duty of counsel to bring to the federal tribunal's attention, *"without delay,"* facts that may raise a question of mootness. See *Board of License Comm'rs of Tiverton* v. *Pastore*, 469 U. S. 238, 240 (1985) *(per curiam).* Nor is a change in circumstances bearing on the vitality of a case a matter opposing counsel may withhold from a federal court based on counsels' agreement that the case should proceed to judgment and not be treated as moot. See *United States* v. *Alaska S. S. Co.*, 253 U. S. 113, 116 (1920); R. Stern, E. Gressman, S. Shapiro, & K. Geller, Supreme Court Practice 721–722 (7th ed. 1993).

District Court's February 1990 declaratory judgment ran, see *supra*, at 55, the Ninth Circuit held the State answerable for the nominal damages Yniguez requested on appeal. See 69 F. 3d, at 948–949 (declaring Yniguez "entitled to nominal damages for prevailing in an action under 42 U. S. C. § 1983" and noting that "[t]he State of Arizona expressly waived its right to assert the Eleventh Amendment as a defense to the award of nominal damages"). We have held, however, that § 1983 actions do not lie against a State. *Will* v. *Michigan Dept. of State Police*, 491 U. S. 58, 71 (1989). Thus, the claim for relief the Ninth Circuit found sufficient to overcome mootness was nonexistent. The barrier was not, as the Ninth Circuit supposed, Eleventh Amendment immunity, which the State could waive. The stopper was that § 1983 creates no remedy against a State.[24]

Furthermore, under the Ninth Circuit's ruling on intervention, the State of Arizona was permitted to participate in the appeal, but not as a party. 939 F. 3d, at 738–740. The Court of Appeals never revised that ruling. To recapitulate,

---

[24] State officers in their official capacities, like States themselves, are not amenable to suit for damages under § 1983. See *Will* v. *Michigan Dept. of State Police*, 491 U. S., at 71, and n. 10. State officers are subject to § 1983 liability for damages in their personal capacities, however, even when the conduct in question relates to their official duties. *Hafer* v. *Melo*, 502 U. S. 21, 25–31 (1991). At no point after the nominal damages solution to mootness surfaced in this case did the Ninth Circuit identify Governor Mofford as a party whose conduct could be the predicate for retrospective relief. That is hardly surprising, for Mofford never participated in any effort to enforce Article XXVIII against Yniguez. Moreover, she opposed the ballot initiative that became Article XXVIII, see *supra*, at 49, n. 1, associated herself with the Attorney General's restrained interpretation of the provision, see *supra*, at 52–53, and was unwilling to appeal from the District Court's judgment declaring the Article unconstitutional, see *supra*, at 56. In this Court, Yniguez raised the possibility of Governor Mofford's individual liability under the doctrine of *Ex parte Young*, 209 U. S. 123 (1908). See Brief for Respondent Yniguez 21–22. That doctrine, however, permits only prospective relief, not retrospective monetary awards. See *Edelman* v. *Jordan*, 415 U. S. 651, 664 (1974).

in July 1991, two months prior to the Attorney General's suggestion of mootness, the Court of Appeals rejected the Attorney General's plea for party status, as representative of the State. *Ibid.* The Ninth Circuit accorded the Attorney General the "right [under 28 U. S. C. § 2403(b)] to argue the constitutionality of Article XXVIII . . . contingent upon AOE and Park's bringing the appeal." *Id.*, at 740; see *supra*, at 59. But see *Maine* v. *Taylor*, 477 U. S. 131, 136–137 (1986) (State's § 2403(b) right to urge on appeal the constitutionality of its laws is not contingent on participation of other appellants). AOE and Park, however, were the sole participants recognized by the Ninth Circuit as defendants-appellants. The Attorney General "ha[d] asked the district court to dismiss him as a party," the Court of Appeals noted, hence he "cannot now become one again." 939 F. 2d, at 740. While we do not rule on the propriety of the Ninth Circuit's exclusion of the State as a party, we note this lapse in that court's accounting for its decision: The Ninth Circuit did not explain how it arrived at the conclusion that an intervenor the court had designated a nonparty could be subject, nevertheless, to an obligation to pay damages.

True, Yniguez and the Attorney General took the steps the Ninth Circuit prescribed: Yniguez filed a cross-appeal notice, see *supra*, at 61; the Attorney General waived the State's right to assert the Eleventh Amendment as a defense to an award of nominal damages, see 69 F. 3d, at 948–949. But the earlier, emphatic Court of Appeals ruling remained in place: The State's intervention, although proper under § 2403(b), the Ninth Circuit maintained, gave Arizona no status as a party in the lawsuit. See 939 F. 2d, at 738–740.[25]

---

[25] Section 2403(b) by its terms subjects an intervenor "to all liabilities of a party as to *court costs*" required "for a proper presentation of the facts and law relating to the question of constitutionality." 28 U. S. C. § 2403(b) (emphasis added). It does not subject an intervenor to liability for damages available against a party defendant.

In advancing cooperation between Yniguez and the Attorney General regarding the request for and agreement to pay nominal damages, the Ninth Circuit did not home in on the federal courts' lack of authority to act in friendly or feigned proceedings. Cf. *United States* v. *Johnson,* 319 U. S. 302, 304 (1943) *(per curiam)* (absent "a genuine adversary issue between . . . parties," federal court "may not safely proceed to judgment"). It should have been clear to the Court of Appeals that a claim for nominal damages, extracted late in the day from Yniguez's general prayer for relief and asserted solely to avoid otherwise certain mootness, bore close inspection. Cf. *Fox* v. *Board of Trustees of State Univ. of N. Y.,* 42 F. 3d 135, 141–142 (CA2 1994) (rejecting claim for nominal damages proffered to save case from mootness years after litigation began where defendants could have asserted qualified immunity had plaintiffs' complaint specifically requested monetary relief). On such inspection, the Ninth Circuit might have perceived that Yniguez's plea for nominal damages could not genuinely revive the case.[26]

When a civil case becomes moot pending appellate adjudication, "[t]he established practice . . . in the federal system . . . is to reverse or vacate the judgment below and remand with a direction to dismiss." *United States* v. *Munsingwear, Inc.,* 340 U. S. 36, 39 (1950). Vacatur "clears the path for future relitigation" by eliminating a judgment the loser was stopped from opposing on direct review. *Id.,* at 40. Vacatur is in order when mootness occurs through happenstance—circumstances not attributable to the parties—or,

---

[26] Endeavoring to meet the live case requirement, petitioners AOE and Park posited in this Court several "controversies remaining between the parties." Reply Brief for Petitioners 18–19. Tellingly, none of the asserted controversies involved Yniguez, sole plaintiff and prevailing party in the District Court. See *ibid.* (describing AOE and Park as adverse to intervenor Arizonans Against Constitution Tampering (AACT), see *supra,* at 61, AACT as adverse to the State, AOE and Park as adverse to the State).

relevant here, the "unilateral action of the party who pre-vailed in the lower court." *U. S. Bancorp Mortgage Co.*, 513 U. S., at 23; cf. *id.*, at 29 ("mootness by reason of settlement [ordinarily] does not justify vacatur of a judgment under review").

As just explained, Yniguez's changed circumstances—her resignation from public sector employment to pursue work in the private sector—mooted the case stated in her com-plaint.[27] We turn next to the effect of that development on the judgments below. Yniguez urges that vacatur ought not occur here. She maintains that the State acquiesced in the Ninth Circuit's judgment and that, in any event, the District Court judgment should not be upset because it was entered before the mooting event occurred and was not properly ap-pealed. See Brief for Respondent Yniguez 23–25.

Concerning the Ninth Circuit's judgment, Yniguez argues that the State's Attorney General effectively acquiesced in that court's dispositions when he did not petition for this Court's review. See *id.*, at 24–25; Brief for United States as *Amicus Curiae* 10–11, and n. 4 (citing *Diamond* v. *Charles*, 476 U. S. 54 (1986)).[28] We do not agree that this Court is disarmed in the manner suggested.

---

[27] It bears repetition that Yniguez did not sue on behalf of a class. See *supra*, at 50; cf. *Preiser* v. *Newkirk*, 422 U. S. 395, 404 (1975) (Marshall, J., concurring) (mootness determination unavoidable where plaintiff-respondent's case lost vitality and action was not filed on behalf of a class); *Sosna* v. *Iowa*, 419 U. S. 393, 397–403 (1975) (recognizing class action ex-ception to mootness doctrine).

[28] Designated a respondent in this Court, the State was not required or specifically invited to file a brief answering the AOE/Park petition. In his appearance form, filed January 10, 1996, Arizona's Attorney General made this much plain: The State—aligned with petitioners AOE and Park in that Arizona defended Article XXVIII's constitutionality—did not op-pose certiorari; in the event Yniguez did not prevail here, Arizona would seek to recoup the attorney's fees the District Court had ordered the State to pay her. See *supra*, at 61, n. 16.

We have taken up the case for consideration on the petition for certiorari filed by AOE and Park. Even if we were to rule definitively that AOE and Park lack standing, we would have an obligation essentially to search the pleadings on core matters of federal-court adjudicatory authority—to inquire not only into this Court's authority to decide the questions petitioners present, but to consider, also, the authority of the lower courts to proceed. As explained in *Bender* v. *Williamsport Area School Dist.*, 475 U. S. 534 (1986):

> "[E]very federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review,' even though the parties are prepared to concede it. *Mitchell* v. *Maurer*, 293 U. S. 237, 244 (1934). See *Juidice* v. *Vail*, 430 U. S. 327, 331–332 (1977) (standing). 'And if the record discloses that the lower court was without jurisdiction this court will notice the defect, although the parties make no contention concerning it. [When the lower federal court] lack[s] jurisdiction, we have jurisdiction on appeal, not of the merits but merely for the purpose of correcting the error of the lower court in entertaining the suit.' *United States* v. *Corrick*, 298 U. S. 435, 440 (1936) (footnotes omitted)." *Id.*, at 541 (brackets in original).

See also *Iron Arrow Honor Soc.* v. *Heckler*, 464 U. S. 67, 72–73 (1983) *(per curiam)* (vacating judgment below where Court of Appeals had ruled on the merits although case had become moot). In short, we have authority to "make such disposition of the whole case as justice may require." *U. S. Bancorp Mortgage Co.*, 513 U. S., at 21 (citation and internal quotation marks omitted). Because the Ninth Circuit refused to stop the adjudication when Yniguez's departure from public employment came to its attention, we set aside the unwarranted en banc Court of Appeals judgment.

As to the District Court's judgment, Yniguez stresses that the date of the mooting event—her resignation from state employment effective April 25, 1990—was some 2½ months after the February 6, 1990, decision she seeks to preserve. Governor Mofford was the sole defendant bound by the District Court judgment, and Mofford declined to appeal. Therefore, Yniguez contends, the District Court's judgment should remain untouched.

But AOE and Park had an arguable basis for seeking appellate review, and the Attorney General promptly made known his independent interest in defending Article XXVIII against the total demolition declared by the District Court. First, the Attorney General repeated his plea for certification of Article XXVIII to the Arizona Supreme Court. See Record, Doc. No. 82. And if that plea failed, he asked, in his motion to intervene, "to be joined as a defendant so that he may participate in all post-judgment proceedings." Record, Doc. No. 93, p. 2. Although denied party status, the Attorney General had, at a minimum, a right secured by Congress, a right to present argument on appeal "on the question of constitutionality." See 28 U. S. C. § 2403(b). He was in the process of pursuing that right when the mooting event occurred.

We have already recounted the course of proceedings thereafter. First, Yniguez did not tell the Court of Appeals that she had left the State's employ. See *supra*, at 68, n. 23. When that fact was disclosed to the court by the Attorney General, a dismissal for mootness was suggested, and rejected. A mootness disposition at that point was in order, we have just explained. Such a dismissal would have stopped in midstream the Attorney General's endeavor, premised on § 2403(b), to defend the State's law against a declaration of unconstitutionality, and so would have warranted a path-clearing vacatur decree.

The State urges that its current plea for vacatur is compelling in view of the extraordinary course of this litigation.

See Brief for Respondents State of Arizona et al. 34 ("It would certainly be a strange doctrine that would permit a plaintiff to obtain a favorable judgment, take voluntary action [that] moot[s] the dispute, and then retain the [benefit of the] judgment."). We agree. The "exceptional circumstances" that abound in this case, see *U. S. Bancorp Mortgage Co.*, 513 U. S., at 29, and the federalism concern we next consider, lead us to conclude that vacatur down the line is the equitable solution.

### V

In litigation generally, and in constitutional litigation most prominently, courts in the United States characteristically pause to ask: Is this conflict really necessary?[29]   When anticipatory relief is sought in federal court against a state statute, respect for the place of the States in our federal system calls for close consideration of that core question. See, *e. g., Poe* v. *Ullman*, 367 U. S. 497, 526 (1961) (Harlan, J., dissenting) ("[N]ormally this Court ought not to consider the Constitutionality of a state statute in the absence of a controlling interpretation of its meaning and effect by the state courts."); *Rescue Army* v. *Municipal Court of Los Angeles*, 331 U. S. 549, 573–574 (1947); Shapiro, Jurisdiction and Discretion, 60 N. Y. U. L. Rev. 543, 580–585 (1985).

Arizona's Attorney General, in addition to releasing his own opinion on the meaning of Article XXVIII, see *supra*, at 52, asked both the District Court and the Court of Appeals to pause before proceeding to judgment; specifically, he asked both federal courts to seek, through the State's certification process, an authoritative construction of the new measure from the Arizona Supreme Court. See *supra*, at 51, and n. 5, 55, 62–63, and nn. 17, 18.

Certification today covers territory once dominated by a deferral device called *"Pullman* abstention," after the gen-

---

[29] The phrasing is borrowed from Traynor, Is This Conflict Really Necessary?, 37 Texas L. Rev. 657 (1959).

erative case, *Railroad Comm'n of Tex.* v. *Pullman Co.*, 312 U. S. 496 (1941). Designed to avoid federal-court error in deciding state-law questions antecedent to federal constitutional issues, the *Pullman* mechanism remitted parties to the state courts for adjudication of the unsettled state-law issues. If settlement of the state-law question did not prove dispositive of the case, the parties could return to the federal court for decision of the federal issues. Attractive in theory because it placed state-law questions in courts equipped to rule authoritatively on them, *Pullman* abstention proved protracted and expensive in practice, for it entailed a full round of litigation in the state court system before any resumption of proceedings in federal court. See generally 17A C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure §§ 4242, 4243 (2d ed. 1988 and Supp. 1996).

Certification procedure, in contrast, allows a federal court faced with a novel state-law question to put the question directly to the State's highest court, reducing the delay, cutting the cost, and increasing the assurance of gaining an authoritative response. See Note, Federal Courts—Certification Before Facial Invalidation: A Return to Federalism, 12 W. New Eng. L. Rev. 217 (1990). Most States have adopted certification procedures. See generally 17A Wright, Miller, & Cooper, *supra*, § 4248. Arizona's statute, set out *supra*, at 51, n. 5, permits the State's highest court to consider questions certified to it by federal district courts, as well as courts of appeals and this Court.

Both lower federal courts in this case refused to invite the aid of the Arizona Supreme Court because they found the language of Article XXVIII "plain," and the Attorney General's limiting construction unpersuasive. See 730 F. Supp., at 315–316; 69 F. 3d, at 928–931.[30] Furthermore, the Ninth

---

[30] But cf. *Huggins* v. *Isenbarger*, 798 F. 2d 203, 207–210 (CA7 1986) (Easterbrook, J., concurring) (reasoned opinion of State Attorney General should be accorded respectful consideration; federal courts should hesitate

Circuit suggested as a proper price for certification a conces-
sion by the Attorney General that Article XXVIII "would
be unconstitutional if construed as [plaintiff Yniguez] con-
tended it should be." *Id.*, at 930; see *id.*, at 931, and n. 14.
Finally, the Ninth Circuit acknowledged the pendency of a
case similar to Yniguez's in the Arizona court system, but
found that litigation no cause for a stay of the federal-court
proceedings. See *id.*, at 931; *supra*, at 62–63, and n. 18 (de-
scribing the *Ruiz* litigation).

A more cautious approach was in order. Through certifi-
cation of novel or unsettled questions of state law for author-
itative answers by a State's highest court, a federal court
may save "time, energy, and resources and hel[p] build a co-
operative judicial federalism." *Lehman Brothers* v. *Schein*,
416 U. S. 386, 391 (1974); see also *Bellotti* v. *Baird*, 428 U. S.
132, 148 (1976) (to warrant district court certification, "[i]t is
sufficient that the statute is susceptible of . . . an interpreta-
tion [that] would avoid or substantially modify the federal
constitutional challenge to the statute"). It is true, as the
Ninth Circuit observed, 69 F. 3d, at 930, that in our decision
certifying questions in *Virginia* v. *American Booksellers
Assn., Inc.*, 484 U. S. 383 (1988), we noted the State's con-
cession that the statute there challenged would be uncon-
stitutional if construed as plaintiffs contended it should be,
*id.*, at 393–396. But neither in that case nor in any other
did we declare such a concession a condition precedent to
certification.

The District Court and the Court of Appeals ruled out
certification primarily because they believed Article XXVIII
was not fairly subject to a limiting construction. See 730
F. Supp., at 316 (citing *Houston* v. *Hill*, 482 U. S. 451, 467
(1987)); 69 F. 3d, at 930. The assurance with which the
lower courts reached that judgment is all the more puzzling

to conclude that "[a State's] Executive Branch does not understand state
law").

in view of the position the initiative sponsors advanced before this Court on the meaning of Article XXVIII.

At oral argument on December 4, 1996, counsel for petitioners AOE and Park informed the Court that, in petitioners' view, the Attorney General's reading of the Article was "the correct interpretation." Tr. of Oral Arg. 6; see *id.*, at 5 (in response to the Court's inquiry, counsel for petitioners stated: "[W]e agree with the Attorney General's opinion as to [the] construction of Article XXVIII on [constitutional] grounds."). The Ninth Circuit found AOE's "explanations as to the initiative's scope . . . confused and self-contradictory," 69 F. 3d, at 928, n. 12, and we agree that AOE wavered in its statements of position, see, *e. g.*, Brief for Petitioners 15 (AOE may "protect its political and statutory rights against the State and government employees"), 32–39 (Article XXVIII regulates Yniguez's "language on the job"), 44 ("AOE might . . . sue the State for limiting Art. XXVIII"). Nevertheless, the Court of Appeals understood that the ballot initiative proponents themselves at least "partially endorsed the Attorney General's reading." 69 F. 3d, at 928, n. 12. Given the novelty of the question and its potential importance to the conduct of Arizona's business, plus the views of the Attorney General and those of Article XXVIII's sponsors, the certification requests merited more respectful consideration than they received in the proceedings below.

Federal courts, when confronting a challenge to the constitutionality of a federal statute, follow a "cardinal principle": They "will first ascertain whether a construction . . . is fairly possible" that will contain the statute within constitutional bounds. See *Ashwander* v. *TVA*, 297 U. S. 288, 348 (1936) (Brandeis, J., concurring); *Ellis* v. *Railway Clerks*, 466 U. S. 435, 444 (1984); *Califano* v. *Yamasaki*, 442 U. S. 682, 692–693 (1979); *Rescue Army*, 331 U. S., at 568–569. State courts, when interpreting state statutes, are similarly equipped to apply that cardinal principle. See *Knoell* v. *Cerkvenik-*

*Anderson Travel, Inc.*, 185 Ariz. 546, 548, 917 P. 2d 689, 691 (1996) (citing *Ashwander*).

Warnings against premature adjudication of constitutional questions bear heightened attention when a federal court is asked to invalidate a State's law, for the federal tribunal risks friction-generating error when it endeavors to construe a novel state Act not yet reviewed by the State's highest court. See *Rescue Army*, 331 U. S., at 573–574. "Speculation by a federal court about the meaning of a state statute in the absence of prior state court adjudication is particularly gratuitous when . . . the state courts stand willing to address questions of state law on certification from a federal court." *Brockett* v. *Spokane Arcades, Inc.*, 472 U. S. 491, 510 (1985) (O'CONNOR, J., concurring).

Blending abstention with certification, the Ninth Circuit found "no unique circumstances in this case militating in favor of certification." 69 F. 3d, at 931. Novel, unsettled questions of state law, however, not "unique circumstances," are necessary before federal courts may avail themselves of state certification procedures.[31] Those procedures do not entail the delays, expense, and procedural complexity that generally attend abstention decisions. See *supra*, at 76. Taking advantage of certification made available by a State may "greatly simplif[y]" an ultimate adjudication in federal court. See *Bellotti*, 428 U. S., at 151.

The course of Yniguez's case was complex. The complexity might have been avoided had the District Court, more than eight years ago, accepted the certification suggestion made by Arizona's Attorney General. The Arizona Supreme Court was not asked by the District Court or the Court of Appeals to say what Article XXVIII means. But the State's highest court has that very question before it in

---

[31] Arizona itself requires no "unique circumstances." It permits certification to the State's highest court of matters "which may be determinative of the cause," and as to which "no controlling precedent" is apparent to the certifying court. Ariz. Rev. Stat. Ann. § 12–1861 (1994).

*Ruiz* v. *Symington,* see *supra,* at 62–63, and n. 18, the case the Ninth Circuit considered no cause for federal-court hesitation. In *Ruiz,* which has been stayed pending our decision in this case, see *supra,* at 63, n. 18, the Arizona Supreme Court may now rule definitively on the proper construction of Article XXVIII. Once that court has spoken, adjudication of any remaining federal constitutional question may indeed become greatly simplified.

\*   \*   \*

For the reasons stated, the judgment of the Court of Appeals is vacated, and the case is remanded to that court with directions that the action be dismissed by the District Court.

*It is so ordered.*

## APPENDIX TO OPINION OF THE COURT

## ARTICLE XXVIII. ENGLISH AS THE OFFICIAL LANGUAGE

*§ 1. English as the official language; applicability*

Section 1. (1) The English language is the official language of the State of Arizona.

(2) As the official language of this State, the English language is the language of the ballot, the public schools and all government functions and actions. .

(3)(a) This Article applies to:

(i) the legislative, executive and judicial branches of government[,]

(ii) all political subdivisions, departments, agencies, organizations, and instrumentalities of this State, including local governments and municipalities,

(iii) all statutes, ordinances, rules, orders, programs and policies[,]

(iv) all government officials and employees during the performance of government business.

(b) As used in this Article, the phrase "This State and all political subdivisions of this State" shall include every entity, person, action or item described in this Section, as appropriate to the circumstances.

§ *2. Requiring this state to preserve, protect and enhance English*

Section 2.   This State and all political subdivisions of this State shall take all reasonable steps to preserve, protect and enhance the role of the English language as the official language of the State of Arizona.

§ *3. Prohibiting this state from using or requiring the use of languages other than English; exceptions*

Section 3.   (1) Except as provided in Subsection (2):

(a) This State and all political subdivisions of this State shall act in English and in no other language.

(b) No entity to which this Article applies shall make or enforce a law, order, decree or policy which requires the use of a language other than English.

(c) No governmental document shall be valid, effective or enforceable unless it is in the English language.

(2) This State and all political subdivisions of this State may act in a language other than English under any of the following circumstances:

(a) to assist students who are not proficient in the English language, to the extent necessary to comply with federal law, by giving educational instruction in a language other than English to provide as rapid as possible a transition to English.

(b) to comply with other federal laws.

(c) to teach a student a foreign language as a part of a required or voluntary educational curriculum.

(d) to protect public health or safety.

(e) to protect the rights of criminal defendants or victims of crime.

82

### § 4. Enforcement; standing

Section 4. A person who resides in or does business in this State shall have standing to bring suit to enforce this Article in a court of record of the State. The Legislature may enact reasonable limitations on the time and manner of bringing suit under this subsection.