ALLSTATE INSURANCE COMPANY, Government Employees Insurance Company, GEICO Casualty Company, GEICO General Insurance Company and GEICO Indemnity Co., Plaintiffs–Appellees,

v.

Gregory V. SERIO, in his capacity as Acting Superintendent of Insurance of the State of New York, Defendant–Appellant.

Docket Nos. 00–7769(L), 00–7780(CON).

United States Court of Appeals, Second Circuit.

Argued: March 5, 2001.

Decided; July 23, 2001.

**144**

Penny Shane, Sullivan & Cromwell, NY, NY, for Plaintiff–Appellee Allstate Insurance Co. (Ellen V. Holloman on the brief).

William P. Maloney, Maloney & Porcelli, NY, NY, for Plaintiff–Appellee GEICO.

Deon J. Nossel, Assistant Solicitor General, for Eliot Spitzer, Attorney General of the State of New York (Michael S. Belohlavek, Deputy Solicitor General on the brief).

Eugene R. Anderson, Anderson, Kill & Olick, NY, NY, for Amicus Curiae United Policyholders.

Before: WALKER, Chief Judge, OAKES, and CALABRESI, Circuit Judges.

CALABRESI, Circuit Judge:

The New York State Department of Insurance [1] ("the Department") appeals from a judgment of the United States District Court for the Southern District of New York (Casey, *J.*) enjoining it from enforcing New York Insurance Law § 2610(b), as well as "rules and regulations promulgated thereunder," against plaintiffs Allstate Insurance Co. ("Allstate") and GEICO General Insurance Co. ("GEICO"). *Allstate Ins. Co. v. Serio*, No. 97 CIV. 0670(RCC) 2000 WL 554221 at *26 (S.D.N.Y. May 5th, 2000). The district court held that § 2610(b), which prohibits auto insurance companies from giving insureds unsolicited referrals to preferred repair shops, unconstitutionally restricts commercial speech, in violation of the First Amendment. In reaching this conclusion, the district court also deemed unconstitutional (1) "Circular Letter 4," a letter issued by the Department of Insurance articulating its interpretation of § 2610(b), (2) a settlement agreement executed by

---

**1.** The named defendant, Gregory V. Serio, is no longer the Acting Superintendent of Insurance for the State of New York. Accordingly, we will refer to the Department of Insurance as the appellant in this case.

Allstate and the Department after Allstate was found by the Department to be in violation of § 2610(b), and (3) the Department's rejection, pursuant to § 2610(b), of a proposal by GEICO to include in its Automobile Casualty Manual a "preferred repairer" clause.

The Department insists that § 2610(b) withstands constitutional scrutiny under prevailing commercial speech doctrine, and that, in any event, the district court should have abstained so that the New York courts would have had an opportunity to construe § 2610(b) before the federal courts assessed its constitutionality. In addition, the Department contends that even if certain applications of the statute violate the Constitution, the district court's injunction, which enjoined *any* enforcement of § 2610(b) against plaintiffs, is overbroad.

We have concluded that we should certify the following questions to the New York Court of Appeals: (1) Is Circular Letter 4 a valid interpretation of New York Insurance Law § 2610(b)? (2) Under § 2610(b), can the Department of Insurance properly impose a settlement of the sort reached by the Department with Allstate? (3) Under § 2610(b), can the Department of Insurance prohibit the "preferred repairer" clause proposed by GEICO for its Automobile Casualty Manual? (4) If any of these Department actions is permitted under Insurance Law § 2610(b), is that statute an unconstitutional regulation of commercial speech under Article I, Section 8 of the New York Constitution?

## BACKGROUND

This case arises out of the State of New York's effort to regulate "steering"—a practice sometimes employed by automobile insurance companies. Steering occurs when an insurance company induces a claimant to select a particular repair shop. Insurance companies engage in this practice because it saves them money; when a claimant is steered to a preferred repair shop,[2] the insurance company is spared the expense of sending out an adjuster to assess the damage to the claimant's vehicle. Generally, the insurance company does not feel the need to oversee the preferred repair shops' method of fixing the damage. Moreover, repair shops sometimes give insurance companies price breaks in exchange for having companies recommend them to claimants. Insurance companies assert that such practices redound to the benefit of claimants because the insurer is likely to have more information about repair shops than does the insured, and can, therefore, help the insured identify and contact competent, efficient, effective repair shops. Furthermore, insurers contend, when a vehicle is sent for repairs to a shop with which the insurance company has a steering agreement, the insurer guarantees the repair shop's work, thus conferring an additional benefit on claimants.

The State of New York, on the other hand, has expressed concern about steering because it feels that the establishment of such relationships between insurers and particular repair shops may be detrimental to claimants. Specifically, the Department has noted that under steering arrangements, "the repairs will be done by a firm that does not have to satisfy its customers to get more business, but, rather, has to satisfy an insurer, whose desires may be opposed to those of the claimants." Under these conditions, and in the absence of

---

**2.** Repair shops to which claimants are "steered" are known as "preferred shops" or "referral shops."

regulation, an insurer might coerce insureds to use repair shops that are less convenient, less competent, or otherwise less efficient than insurers might use if left to their own devices.[3]

### A. The Statutory Scheme

In 1973, in an effort to combat steering, the New York State Legislature passed Insurance Law § 2610(a). It reads: "Whenever a motor vehicle collision or comprehensive loss shall have been suffered by an insured, no insurer providing collision or comprehensive coverage therefor shall require that repairs be made to such vehicle in a particular place or shop or by a particular concern." NY Ins. Law § 2610(a). The law was designed to preserve a claimant's right to choose the location where repair work will be done and to prevent insurance companies from penalizing insureds who do not use preferred shops.

In 1974, Insurance Law § 2610(b) was passed. It prevents insurers from making unsolicited recommendations or suggestions to claimants that they have work done at particular repair shops. That provision states: "In processing any such claim (other than a claim solely involving window glass), the insurer shall not, unless expressly requested by the insured, recommend or suggest repairs be made to such vehicle in a particular place or shop or by a particular concern."[4] NY Ins. Law § 2610(b). This law, too, was designed to

protect policyholders from steering. It aimed, however, at a more subtle form of the practice than did § 2610(a). While subsection (a) prohibits insurers from explicitly requiring the use of given repair shops, subsection (b) is designed to reach conduct that might lead a vulnerable claimant to *feel* as if he or she were required to use a recommended repair shop.

An insurer who is deemed by the State Superintendent of Insurance to have violated one of these provisions is entitled to a hearing before the imposition of any penalty. NY Ins. Law § 109(c). Insurers are required to submit to the Superintendent for approval any proposed policy form, and if the Superintendent disapproves of the form, the insurer is again entitled to a hearing. NY Ins. Law § 2322(b). Final determinations by the Superintendent are subject to judicial review in an Article 78 proceeding. NY Ins. Law § 326(a).

### B. Enforcement of § 2610(b)

In the early 1990s, in response to continued complaints about steering, the Department undertook a study of insurers' practices to determine whether insurers were complying with the anti-steering laws, and specifically with § 2610(b). As a result of its investigation, the Department concluded that all of the insurance companies investigated were violating § 2610(b).

---

**3.** Independent repair shops—smaller repair shops that are less likely to be preferred shops and that tend to lose business as a result of steering arrangements between insurers and large repair shop franchises—contend that insurance companies' use of preferred shops undermines the quality and safety of repair services. These independent repair shops complain, moreover, that steering stifles competition and threatens the ability of smaller shops to survive.

**4.** The exception for claims "solely involving window glass" was inserted in 1983. It was added (by overwhelming majority votes in both houses of the State Legislature) because it was determined that "the insurer or its local agent is in the best position to recommend a reliable repair shop in the community which will perform the work at competitive and reasonable rates." Letter of June 21, 1983 from Assemblyman Howard L. Lasher to Governor's Office.

Plaintiff Allstate was among those deemed to be in violation. Specifically, the Department concluded that Allstate's promotion of its "PRO (Priority Repair Option) Program" was unlawful. Under this program, Allstate employees were required, in dealing with claimants, to inquire whether the claimant had a repair shop to which she would like to bring her vehicle. If (and only if) the insured answered in the negative, the Allstate representative would ask whether the insured would like Allstate to recommend a repair shop in the area. If (and only if) the insured indicated that she would like such a recommendation, the insurer would recommend that the claimant go to a shop that was part of the PRO Program.[5] In this way, Allstate hoped to circumvent the ban against unsolicited referrals.

The Department believed that by (1) prompting claimants to request referrals, (2) posting signs and brochures about the PRO Program in Allstate offices, and (3) advertising the fact that it guaranteed work performed at participant "PRO Shops" without explaining that the guarantee was required by law, Allstate was violating § 2610(b). The Department communicated its view to Allstate. Allstate denied that its conduct transgressed § 2610(b) and submitted to the Department a statement explaining its position. Unmoved by Allstate's explanation, the Department informed Allstate that it planned to impose a $100,000 penalty on the insurer unless Allstate agreed to revise its procedures.

A formal settlement between Allstate and the Department was reached and me-morialized in a Settlement Letter ("the Settlement Letter"), executed on January 31, 1994. In it, Allstate denied having violated New York law, but, nevertheless, agreed to revise its procedures. (1) Allstate agreed that once a claim was reported, it would not, unless requested to do so, mention or recommend a repair facility, or list suggested repair facilities; (2) Allstate promised not to inform claimants about the requirements of § 2610(b) unless asked to do so; (3) Allstate could continue to promote and advertise the PRO Program in mailings and brochures made available to prospective customers, applicants, and policyholders;[6] (4) Allstate agreed not to have signs or brochures advertising the PRO Program displayed at claim facilities or sales offices and agreed not to distribute any such materials to policyholders at these locations unless requested to do so.[7] Other insurance companies entered into similar settlement agreements with the Department.

On April 7, 1994, the Department issued "Circular Letter 4," which articulated its interpretation of § 2610. A Circular Letter "sets forth the Insurance Department's views on a particular matter and is circulated to insurance companies." Appellant's Brief at 14. Circular Letter 4 contains roughly the same terms as the Settlement Letter. Most important, it states that:

No insurer should suggest to their policyholders who present claims that the policyholder should request a recommendation or referral, including by distributing copies of § 2610 itself....

---

**5.** Allstate representatives were provided with a "script" mapping out the desired progress of such a conversation with a claimant.

**6.** The letter acknowledged that mass mailings would cause certain policyholders with pending claims to receive PRO materials; it was agreed that this was acceptable, but that Allstate would not knowingly send any PRO materials to claimants.

**7.** Allstate's new "script" for its employees reflects these changes in procedure.

[S]igns mentioning or describing an insurer's repair program should not be displayed at any drive-in claim facility, sales office or other insurer locations.

Circular Letter 4 thus prohibits various ways of soliciting requests for recommendations to preferred shops.

Soon after Circular Letter 4 was distributed, GEICO submitted to the Department proposed revisions to its Automobile Casualty Manual ("the proposal"). The Manual was to include a section entitled "Preferred Repairer," which stated, in pertinent part:

In consideration of the premium charged for coverage . . . you agree with us that, in the event of a covered loss resulting in damage to your auto, you request that we recommend repair facilities. . . . You agree with us that covered repairs will be completed at a repair shop recommended by us. (emphasis omitted).

GEICO insisted that § 2610 only prohibited unsolicited recommendation of repair shops to individuals with "live" claims. Because the proposed policy manual sought consent *before* any accident occurred, it did not, in GEICO's view, violate the statute or Circular Letter 4.[8]

The Department rejected GEICO's proposal. The Department explained that this *ex ante* consent scheme did not comport with the requirements of § 2610. GEICO resubmitted its proposal and requested further consideration; it was again rejected.

**8.** GEICO informed the Department, moreover, that it believed that savings of 5%–10% could be passed along to consumers as a result of this new policy.

**9.** Before turning to the *Central Hudson* test, the district court rejected a handful of affirmative defenses that had been interposed by the Department, finding that the plaintiffs had standing to sue, that neither estoppel nor laches prevented the suits, and that the stat-

## C. Proceedings Below

Allstate and GEICO filed suit separately in the United States District Court for the Southern District of New York. Allstate alleged that § 2610(b) violated its free speech rights under the First and Fourteenth Amendments to the U.S. Constitution and under the New York State Constitution. It also claimed that the Settlement Letter and Circular Letter 4 impermissibly restricted its commercial speech rights under the U.S. and New York Constitutions. GEICO made parallel claims, alleging specifically that the Department's rejection of its proposal violated its commercial speech rights under the U.S. and New York Constitutions. The plaintiffs sought declaratory judgments that § 2610(b) was unconstitutional as applied to them. In addition, Allstate asked to have the Settlement Letter made void, and GEICO requested that the Department's rejection of its proposal be overturned. Finally, the parties sought injunctions preventing the enforcement of the Settlement Letter and Circular Letter 4.

Though the suits were filed separately, the district court disposed of them in a single opinion. *See Allstate*, 2000 WL 554221. Judge Casey awarded summary judgment to the plaintiffs. In reaching its conclusion, the district court applied the three-part test articulated in *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980):[9]

Commercial speech that is neither unlawful nor misleading may be regulated

ute of limitations had not expired. *Allstate*, 2000 WL 554221 at \*13–\*14. Judge Casey also held that " § 2610(b) regulates speech, not conduct," and that it was not "content neutral." *Id.* at \*17–\*18. None of these findings is challenged in this appeal.

Judge Casey briefly addressed the question of whether § 2610(b) regulated only commercial speech, or whether it reached non-commercial speech as well. Though he expressed

by a government only if: (1) the government asserts a substantial interest in support of its regulation; (2) the government demonstrates that the restriction on commercial speech directly and materially advances that interest; and (3) the regulation is "narrowly drawn" and not more extensive than necessary to serve the substantial government interest.

*Allstate,* 2000 WL 554221 at *20 (*citing Central Hudson,* 447 U.S. at 564–65, 100 S.Ct. 2343).

The district court first held that the speech regulated by § 2610(b) and by the other challenged actions of the Department (*i.e.,* the Settlement Letter, Circular Letter 4) was neither unlawful nor misleading. Judge Casey also found that "the State has a substantial interest in regulating the insurance industry and in protecting consumers." *Id.* at *22. He concluded, however, that § 2610(b) did not directly and materially advance this interest. The court determined that "[t]he Department set forth no reliable proof that consumers experience any confusion about their rights in the repair shop selection process, or in any way feel coerced or intimidated by insurers."[10] *Id.* at *24. Rather than serving legitimate consumer protection interests, § 2610(b), in the district court's view, would actually cause policyholders to receive misleading information. *See id.* at *23 ("[T]he glaring omission of § 2610(b) from the available information to the insureds, in effect, keeps insureds in the dark about their

rights and provides them with a half-truth."). Judge Casey thus rejected both the Department's premise—that there was evidence of a need for this kind of consumer protection, and its conclusion—that § 2610(b) provided such protection. Finally, the district court held that even if the statute were deemed materially and directly to advance the government's interest in consumer protection, it was not "narrowly drawn" to serve that interest, thereby violating the third prong of the *Central Hudson* test, and it remarked that any interest in promoting competition and protecting small, independent repair shops would be better served by anti-trust law than by bans on commercial speech. *Id.* at *25.

The district court found that the state's interest in protecting consumers from being compelled by insurance companies to select a particular repair shop was adequately served by § 2610(a). § 2610(b) was, in essence, held to be overkill. *Id.* at *25. Accordingly, the district court issued an order awarding declaratory judgment to the plaintiffs, enjoining the Department from enforcing § 2610(b) and Circular Letter 4 against Allstate and GEICO, and annulling the Settlement Letter executed between Allstate and the Department.

This appeal followed.

## DISCUSSION

### I

■ It is axiomatic that the federal courts should, where possible, avoid reach-

---

serious doubt as to whether the statute could be construed to reach only commercial speech, he explained that because, in his view, § 2610(b) could not pass even the "less-rigorous test" for assessing the constitutionality of restrictions on commercial speech, it was "unnecessary for the court to examine the statute under the stricter standard applied to non-commercial speech." *Id.* at *20.

10. Earlier in the opinion, Judge Casey had deemed inadmissible evidence presented by

the Department in support of the notion that policyholders were uniquely vulnerable at the time of filing a claim and that they might be coerced into selecting a particular repair shop as a result of practices like those prohibited under Circular Letter 4. Judge Casey determined that the evidence was anecdotal and unreliable, and, therefore, inadmissible hearsay. *Allstate,* 2000 WL 554221 at *10.

ing constitutional questions. *See, e.g., Spector Motor Serv., Inc. v. McLaughlin,* 323 U.S. 101, 105, 65 S.Ct. 152, 89 L.Ed. 101 (1944) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable."); *Ashwander v. TVA,* 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, *J.,* concurring) ("[I]f a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter."); *Clinton v. Jones,* 520 U.S. 681, 690, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997) ("[W]e have often stressed the importance of avoiding the premature adjudication of constitutional questions.").

This canon of constitutional avoidance manifests itself in a variety of ways. Thus, the courts will take pains to give a statute a limiting construction in order to avoid a constitutional difficulty. *See, e.g., Able v. United States,* 88 F.3d 1280, 1298 (2d Cir.1996); *Carlin Communications Inc. v. FCC,* 837 F.2d 546, 558 (2d Cir.1988). And, where possible, courts will render decisions on federal constitutional questions unnecessary by resolving cases on the basis of state law (whether statutory or constitutional). *See, e.g., Bell v. Maryland,* 378 U.S. 226, 237, 84 S.Ct. 1814, 12 L.Ed.2d 822 (1964) (referring to the Court's "policy of refusing to decide a federal question in a case that might be controlled by a state ground of decision").

Where a decision is to be made on the basis of state law, however, the Supreme Court has long shown a strong preference that the controlling interpretation of the relevant statute be given by state, rather than federal, courts. *See, e.g., Arizonans for Official English v. Arizona,* 520 U.S. 43, 76, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) (noting the advantage of "plac[ing] state-law questions in [state] courts [which are] equipped to rule authoritatively on them"); *Lehman Bros. v. Schein,* 416 U.S. 386, 391, 94 S.Ct. 1741, 40 L.Ed.2d 215 (1974) (remarking that, with respect to state law, the federal courts act "as 'outsiders' lacking the common exposure to local law which comes from sitting in the jurisdiction"); *Poe v. Ullman,* 367 U.S. 497, 526, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting) (stating that "normally this Court ought not to consider the Constitutionality of a state statute in the absence of a controlling interpretation of its meaning and effect *by the state courts*") (emphasis added). This preference is rooted in basic principles of federalism, for a federal court "risks friction-generating error when it endeavors to construe a novel state Act not yet reviewed by the State's highest court." *Arizonans,* 520 U.S. at 79, 117 S.Ct. 1055; *see also In re Joint Eastern and Southern District Asbestos Litigation,* 78 F.3d 764, 776 (2d Cir.1996) (taking note of the "serious disruption by federal courts of state government or needless friction between state and federal authorities that could arise when a federal court decided issues that normally turn on legislation with much local variation interpreted in local settings") (internal quotation marks omitted).

Two practices in particular—*"Pullman* abstention" and certification—can be used by federal courts to avoid (a) premature decisions on questions of federal constitutional law, and (b) erroneous rulings with respect to state law.[11] *Pullman* absten-

---

11. Of course, federal courts may, by interpreting state law, create friction even when they read that law correctly. There is, after all, an intrusion into state sovereignty implicit in the

tion derives from the Supreme Court's holding in *Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), which remanded a case to the district court with instructions that that tribunal delay decision on a difficult question of federal constitutional law until the Texas state courts clarified whether the conduct under constitutional attack was authorized by state law. "If there was no warrant in state law for the [challenged action]," the Court noted, "there is an end of the litigation; the constitutional issue does not arise." *Id.* at 501, 61 S.Ct. 643. Until a conclusive determination was offered by the state courts as to the potentially dispositive state law question, the federal courts were instructed neither to take up the federal constitutional issue nor to interpret the relevant state law themselves.

■ Certification serves similar purposes. It permits federal courts to ask the highest court of a state directly to resolve a question of state law and to do so while the federal suit is pending. *See, e.g.,* N.Y. Comp.Codes R. & Regs. tit. 22, § 500.17(a) (1999) ("Whenever it appears to the Supreme Court of the United States, any United States Court of Appeals, or a court of last resort of any other state, that determinative questions of New York law are involved in a cause pending before it for which there is no controlling precedent of the Court of Appeals, such

court may certify the dispositive questions of law to the Court of Appeals.").[12] Like abstention, certification "is appropriate in those circumstances where the state statute is susceptible of an interpretation that 'would eliminate the constitutional issue and terminate the litigation.'"[13] *Tunick v. Safir,* 209 F.3d 67, 75 (2d Cir.2000) (quoting *Baggett v. Bullitt,* 377 U.S. 360, 377, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964)); *see also id.* ("Given the shared goals of *Pullman* abstention and of the device of certification, the factors counseling the former are also suggestive of when the latter is desirable").

■ In *Arizonans,* the Supreme Court indicated that certification is usually preferable to abstention. The Court explained:

> Certification today covers territory once dominated by a deferral device called *"Pullman* abstention".... Designed to avoid federal-court error in deciding state-law questions antecedent to federal constitutional issues, the *Pullman* mechanism remitted parties to the state courts for adjudication of the unsettled state-law issues.... Certification procedure, in contrast, allows a federal court faced with a novel state-law question to put the question directly to the State's highest court, reducing the delay, cutting the cost, and increasing the assurance of gaining an authoritative response.

decision to *take up* an indeterminate question of state law, instead of first seeking guidance from a state court.

**12.** The several states apply divergent rules with respect to certification. Unlike New York, the Supreme Court of Connecticut also permits certification from U.S. District Courts, *see* CT R. RAP. § 82-1 (1998). The Supreme Court of New Jersey allows certification from the Third Circuit only. *See* N.J. R.A. R.2:12A-1 (2000).

**13.** Of course, it is not the case that certification (or abstention) is appropriate whenever (1) a state law is challenged on federal constitutional grounds, (2) the highest court of the state has not interpreted the relevant statute, and (3) a saving construction (*i.e.,* one that would permit avoidance of the constitutional issue) is possible. *See Tunick,* 209 F.3d at 74 (identifying cases in which the Supreme Court has declined to certify notwithstanding the fact that all of these factors seemed to recommend certification).

*Arizonans,* 520 U.S. at 75–76, 117 S.Ct. 1055 (citation omitted). Indeed, the advantages of certification relative to abstention are not limited to the efficiency-related factors mentioned by the *Arizonans* Court. Certification means that, if the state court's decision as to state law does not render a federal constitutional judgment unnecessary, the *federal* issue will be resolved by a *federal* court. Conversely, abstention leads to the federal question being decided by a state court, which is subject to federal review only through the unlikely route of *certiorari* to the U.S. Supreme Court. By certifying, therefore, the federal courts can refer the state law issues to state courts, while retaining the authority to rule on the federal constitutional questions that might come up, rather than ceding that responsibility, as an initial (and usually conclusive) matter, to the state courts.

The desirability of certification in such circumstances becomes apparent when one considers how federal appellate courts regularly behave when presented with analogous cases involving federal statutes. If a *federal* agency had issued, under a *federal* statute, regulations—like the ones before us—that raise possible constitutional difficulties, and the parties attacked those regulations as unconstitutional as applied to them, and if we believed that the federal statute might be read as not countenancing the regulations in question, we would surely not rule on whether the underlying federal statute was constitutional until we had examined in depth the correctness of that "saving" construction. Where interpretation of a statute might resolve the case, and thereby obviate the need for any inquiry into constitutional questions, a ruling on the constitutional issues without prior examination of the statute's scope and meaning would be viewed as an extraordinary bit of overreaching. And certification does no more than give the highest court of a state an opportunity to do with a *state* law what we would do, as a matter of course, were we dealing with a federal statute.

■ It is not the case, moreover, that certification is appropriate only where a federal court, applying federal rules of construction, can see a proper way to construe the relevant statute so as to eliminate any constitutional defect. It may well be that the courts of the relevant state are less constrained than is the federal judiciary with respect to statutory interpretation. It is possible, that is, that under the applicable state law, state courts have more flexibility and broader interpretive power than do the federal courts. In such circumstances, federal courts ought not to deprive the state courts of the opportunity to construe their own statutes, using the interpretive tools, presumptions, and standards they deem proper. For this too would infringe on the sovereign authority of the states.[14] And this is true even if well-established federal rules of statutory construction would preclude a similar interpretation of a federal statute, and even

**14.** It has been suggested that certification unduly burdens the state courts. *See e.g., Elliott Assocs. L.P. v. Banco de la Nacion,* 194 F.3d 363, 370 (2d Cir.1999) (noting that certification should "not be a device for shifting the burdens of this Court to those whose burdens are at least as great"). But of course, this would occur only if the state courts were *required* to take up questions certified to them by the federal courts. Because the highest court of a state is free to decline certification, *see, e.g., Tunick v. Safir,* 94 N.Y.2d 709, 709 N.Y.S.2d 881, 731 N.E.2d 597 (2000) (*per curiam*) (declining certification); *see also* N.Y. Comp.Codes R. & Regs. tit. 22, § 500.17, this concern is usually overstated. If, moreover, the highest state court does decline certification, this court, once having given the state a first shot at reading its law, has full latitude to interpret the relevant state law.

if absent such a saving interpretation the statute would likely be unconstitutional.

## II

■ Neither the text of Insurance Law § 2610(b) nor the case law from New York provides a conclusive answer to the question of whether the Department's construction of that provision—as manifested in Circular Letter 4, the Settlement between the Department and Allstate, and the rejection of GEICO's new policy—is a proper one. Indeed, § 2610(b) has never been interpreted by the New York courts at all. Similarly, we have no information as to whether the New York Constitution would bar one or another of these restrictions on commercial speech grounds, should the statute be read to permit them: In this respect, we note that, unlike *Tunick*, the validity of the regulations under the New York Constitution has been raised, briefed, and argued by the parties. *See Tunick*, 709 N.Y.S.2d at 883, 731 N.E.2d 597 (pointing out that while "the presence of the State constitutional issue . . . explicitly weighed in the balance favoring certification . . ., [t]he parties themselves . . . did not raise, brief or argue a State constitutional issue") (citations omitted).

A decision of the Court of Appeals on these questions of state law might well resolve all the claims brought by the parties in the case before us, and do so without requiring any decision as to the validity of the statute under the United States Constitution.[15] If the Court of Appeals finds that the actions of the Department of Insurance are improper under § 2610(b), the challenges presented by Allstate and GEICO will be disposed of on state law grounds. Similarly, if the Court of Appeals interprets the statute as permitting the challenged regulatory actions, but deems the statute invalid under the New York Constitution, the plaintiffs' demands will be met, and, once again, the federal constitutional question will be avoided.[16]

■ There are, moreover, several other factors, specific to this case, that make certification particularly appropriate. First, taking up the question of whether § 2610(b) is constitutional inevitably requires this court to think up hypothetical regulations or actions under the statute that might possibly be valid under the *Central Hudson* test. Such an inquiry is not only difficult and premature, but its very abstract nature makes suspect any conclusion that might result from it. Second, the Attorney General of the State of New York has strongly argued, both at oral argument and in the State's brief, that a saving construction of § 2610(b) *is* possible. *See* Appellant's Brief at 53 ("[T]here is a substantial question as to whether under New York law § 2610(b) may properly be construed to prohibit the practices referred to in the Settlement Letter and Circular Letter 4.").[17] He has also urged

---

**15.** These claims, moreover, cannot be dealt with on straightforward Eleventh Amendment grounds because, in addition to seeking an injunction, the plaintiffs asked for a declaratory judgment. And while an injunction might well violate the Eleventh Amendment, *see Pennhurst*, 465 U.S. at 106, 104 S.Ct. 900, a declaratory judgment would not.

**16.** While the parties may have an interest in a finding that the statute is facially invalid, they have not expressly asked for such relief. And,

to the extent that the parties do present a facial challenge to § 2610(b), it is an "overbreadth" challenge, and such a challenge cannot lie with respect to a regulation of commercial speech. *See Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 504 n. 11, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981).

**17.** Notably, Allstate had already proposed a saving construction. *See* Letter of April 7, 1983 from David R. Leonard, Counsel to All-

us to certify the relevant questions (with respect to Allstate, but not GEICO) to the Court of Appeals. *See* Appellant's Letter Brief at 1. And the Supreme Court has stated that, under these conditions, a certification request "merit[s] more respectful consideration." *Arizonans*, 520 U.S. at 78, 117 S.Ct. 1055. Third, the Supreme Court cases dealing with certification suggest that the practice is especially desirable where the challenged legislation goes to the basic sovereign functions of state government. *See Tunick*, 209 F.3d at 77 (noting the distinction, implicit in the Supreme Court's cases, between state laws that do and do not "center on core functions of state governments"). In such cases, the potential for friction between state and federal government increases, and the threat to principles of federalism, if certification is not sought, is particularly strong. Because § 2610(b) regulates insurance—paradigmatically a state field [18]—there is, therefore, greater cause for this court to stay its hand (at least temporarily). Finally, the meaning of § 2610(b) presents undecided issues of state law that are both important and recurring.

## CONCLUSION

Accordingly, we hereby respectfully certify the following questions to the New York Court of Appeals:

(1) Is Circular Letter 4 a valid interpretation of New York Insurance Law § 2610(b)?

(2) Under § 2610(b), can the Department of Insurance properly impose a settlement of the sort reached by the Department with Allstate?

(3) Under § 2610(b), can the Department of Insurance prohibit the "preferred repairer" clause proposed by GEICO for its Automobile Casualty Manual?

(4) If any of these Department actions is permitted under Insurance Law § 2610(b), is that statute an unconstitutional regulation of commercial speech under Article I, Section 8 of the New York Constitution?

The certified questions may be deemed expanded to cover any further pertinent question of New York law involved in this appeal that the Court of Appeals chooses to answer. This panel retains jurisdiction to consider all issues that may remain before us once the Court of Appeals has either provided us with its guidance or declined certification.

It is therefore ordered that the Clerk of this court transmit to the Clerk of the Court of Appeals of the State of New York a Certificate, as set forth below, together with a complete set of the briefs, appendices, and record filed in this Court by the parties.[19]

---

state, to David Holstein at the New York State Insurance Department.

**18.** *See* 15 U.S.C. § 1012 (McCarron Ferguson Act) ("'(a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business; (b) ... No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance.'")

**19.** Because the state has agreed, pending a decision of the issues here presented, not to enforce the challenged regulatory actions, *see* New York Insurance Department Circular Letter No. 16 (May 10, 2000), we are not faced with the question of whether and how to protect the plaintiff's asserted constitutional rights in the interim. *See, e.g., Tunick*, 209 F.3d at 79–80. Similarly, we need not decide, at this time, questions relating to the scope of the district court's injunction. Should the parties believe that actions are being taken that infringe on constitutional rights while the

## CERTIFICATE

The foregoing is hereby certified to the Court of Appeals of the State of New York, pursuant to 2d Cir. R. § 0.27 and N.Y. Comp. R. & Regs. tit. 22, § 500.17, as ordered by the United State Court of Appeals for the Second Circuit.

JOHN M. WALKER, JR., Chief Judge, concurring:

I concur in the judgment certifying the questions set forth in the conclusion to Judge Calabresi's opinion. I concur in only as much of Judge Calabresi's reasoning as justifies certification as appropriate in cases where: (1) there is an unresolved question of state law that will (2) conclusively determine the outcome of the litigation and (3) avoid federal constitutional questions when (4) the delays associated with *Pullman* abstention are great and potentially outcome-determinative. Where the circumstances of a case would support *Pullman* abstention, certification serves the same purpose more efficiently.

Because New York Insurance Law § 2610(b) and its application to Allstate and GEICO in this case raise serious federal constitutional questions under prevailing commercial speech doctrine, I believe that certification is the appropriate course.

OAKES, Senior Circuit Judge, concurring:

The New York State Consumer Protection Board said as to section 2610(b), when it was proposed, that:

> The bill prohibits a practice which has been reported to the Board wherein an insurer, having a tie-in agreement with an auto body repair shop, will unduly coerce a consumer to have the repairs effected at a shop selected by the insurer.

case is *sub judice,* they may, of course, make

According to the New York Insurance Department, the "complaints received by this Department indicate that the consumer is left to deal with a body shop which has no interest in satisfying its customers." Thus, section 2610 in both of its subsections is a consumer protection law prohibiting insurers from requiring repairs to be made at a particular shop and from coercing their insureds to have the repairs effected at a particular shop. This seems to be very much a regulation of the business of insurance which by the McCarron–Ferguson Act is subject to the laws of the several states and cannot be impaired or superseded by any act of Congress. *See* 15 U.S.C. § 1012 (2000). Circular Letter 4 simply spells out for insurers what they can and cannot do as to "steering":

> Insurers may maintain a repair program and in the ordinary course of business disseminate directly or through their agents information and literature fully describing the program's existence and benefits, to prospective customers, to applicants and to policy holders. It is understood that sales or renewal materials of this kind may reach a policy holder who has a pending claim. Consistent with paragraph 1 above, however, literature referring to any repair program or insurer guarantees concerning repairs, should not be knowingly distributed to a policy holder once a claim has been reported.

It seems to me that section 2610(b) and the interpretation of it that is contained in Circular Letter 4 are entirely consistent with the First and Fourteenth Amendments to the U.S. Constitution in that there is a substantial state interest in protecting the right of insureds to select their own repair shop. Indeed, twenty-nine states other than New York also have laws

appropriate motions to this court.

prohibiting insurers from requiring repairs to be made at a particular shop. Section 2610(b) directly and materially advances the state's interest by protecting insureds against coercion by insurers, and that section is sufficiently narrowly drawn so as to comply totally with *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) and its progeny. I would, therefore, have little problem in signing a judgment of reversal.

My colleagues prefer, however, to take the cautious—some would say "prudent"— course of certifying to the New York Court of Appeals the questions they propose. I would hope that the very act of certification, if the New York Court of Appeals grants it, will not induce that court to give a narrow interpretation to what the New York legislature thought was a salutary consumer protection bill merely on the basis that it conceivably could fall under the protection of commercial free speech. Certainly the *GEICO* case presents a proposed endorsement which, in my view, clearly violates not only section 2610(b) but also section 2610(a) in that it requires the insured to agree that "covered repairs will be completed at a repair shop recommended by us" with the penalty that, if the insured does not do so, he "will be paid the amount of the estimate prepared by us and/or the preferred repairer."

I concur with Judge Calabresi that the case should be certified, with the caveats hereby expressed.