**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 5, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

C & A CONSTRUCTION
COMPANY, a Utah corporation;
LYNN A. GILBERT, as Trustee of the
Black Diamond Construction Trust;
BLACK DIAMOND
CONSTRUCTION 1 BUSINESS
TRUST,

        Plaintiffs-Appellants,

v.

DHC DEVELOPMENT, a Nevada
limited liability company; STEVEN P.
DANKO; ZIONS FIRST NATIONAL
BANK,

        Defendants-Appellees.

No. 11-4139
(D.C. No. 2:08-CV-00258-BSJ)
(D. Utah)

---

**ORDER AND JUDGMENT**[*]

---

Before **TYMKOVICH** and **BALDOCK**, Circuit Judges, and **BRORBY**, Senior
Circuit Judge.

---

[*]    After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and
collateral estoppel. It may be cited, however, for its persuasive value consistent
with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

This appeal involves a dispute over a construction contract. As is often the case in such disputes, each party to the contract--owner DHC Development ("DHC") and general contractor C&A Construction Company ("C&A")--contends that the other breached the contract and was responsible for the resulting damages.[1] The district court entered two orders designed to dispose of all of the parties' claims and counterclaims. In its first order, it granted DHC partial summary judgment on certain claims involving a mechanic's lien asserted by C&A. In its second, final order, it estimated the value of each party's remaining claims, then offset the estimated value of these claims against one another. The district court accompanied this second order with a judgment awarding DHC the difference remaining after the offset.

In its appellate briefing, C&A points to several alleged deficiencies in each of these orders, and urges that both orders be reversed on the merits. DHC responds that the district court's orders are soundly reasoned and should be affirmed. But having carefully reviewed the challenged orders and the

---

[1] There are actually three appellants: C&A, and two trusts that putatively hold an interest in C&A's claims against DHC. The relationships between these three entities, and the problems this poses for the parties' standing on appeal, are explored further in the analysis section of this decision, *infra*. Throughout this order and judgment, we refer to all three entities, collectively, as "C&A." Similarly, Steven P. Danko, a principal of DHC, is named as an appellee, but we generally refer to him and DHC collectively as "DHC." The other appellee, Zions First National Bank, which served as escrow agent under the Agreement, has not participated in this appeal.

voluminous record,[2] we find ourselves unable to reach a disposition on the merits for either party on the issues presented. Simply put, the unusual procedural path the district court followed in this case leaves us without an adequately reviewable final decision.

The problems with this case are illustrated by the fact that the parties cannot agree on what the district court did. Although the parties do not expressly challenge the form of the district court's judgment, preferring instead to argue about its substance, we find that its disposition failed to resolve so many essential issues in this complex case that it simply cannot be upheld in its present format.[3] Although in general we may affirm the district court's order on any basis that finds adequate record support, the state of the record here does not permit us to undertake a de novo review of the evidence and enter summary judgment with proper findings and conclusions for the first instance on appeal. We may certainly not establish a specific amount of damages on summary judgment review, and thus, the district court's order granting a judgment for a specific

---

[2]     The appellate record is nearly 2,400 pages long.

[3]     Oddly, C&A reserves its only real appellate challenge to the procedural aspects of the district court's disposition for its appellate motion seeking our blessing to include certain materials in its appendix and supplemental addendum. There, it launches a strongly-worded attack on the district court's improper grant of what it characterizes as summary judgment entered without proper notice. Such a procedural challenge is notably absent from C&A's appellate briefing, though C&A does ask us to apply a more stringent standard of review because summary judgment was entered sua sponte, and contends that the district court improperly resolved disputed factual questions on summary judgment.

dollar figure cannot be sustained.  With some regret for the considerable time and effort already expended in this case, we therefore find it necessary to vacate the challenged final order and to remand to the district court for further proceedings.

## BACKGROUND

### 1.  The Agreement

The dispute involves the construction of the Black Diamond Project ("Project"), a condominium development in Brian Head, Utah.  C&A and DHC entered into a Construction Agreement ("Agreement") governing construction of the Project.  Phase I of the Agreement called for C&A to construct 21 condominium units in three buildings, for which DHC agreed to pay the Contract Price of $6,661,633.[4]  Payment for additional services or materials beyond the Contract Price was to be made by DHC in accordance with the Agreement's change order procedures.  *See* Aplt. App., Vol. 1 at 166.

As portions of Phase I were completed, C&A was entitled to receive progress payments.  The Project's architect was responsible for evaluating C&A's progress-payment applications and the work performed.  Within 20 calendar days of its receipt of an application for payment approved by the architect, DHC was required to make the appropriate progress payment to C&A. C&A requested such

---

[4]    Though the Agreement refers to 21 units, *see* Aplt. App. at 164, both DHC and the district court used a figure of 23 units.  Any discrepancy on this point is immaterial to our result.

progress payments by certifying that C&A had completed the work specified in accordance with the Agreement, that C&A had paid all amounts due to subcontractors and suppliers of materials for which DHC had previously paid moneys to C&A, and that the current payment shown was now due.

Occasionally, upon receiving a progress payment, C&A would also execute a waiver and release, releasing DHC from C&A's right to a mechanic's lien and to any claim for the amount paid. But C&A asserts that these releases were never intended to release DHC's responsibility to pay for change orders.

The Agreement required C&A to finish Phase I within 210 calendar days from its start date. The parties disagree concerning to what extent the completion date was extended by the parties, and whether C&A failed to complete the Project in a timely manner.

During construction, DHC was free to order minor changes to the Project that did not involve adjustments to the contract price or additional completion time. But in the event of more substantial changes, C&A was entitled to "additional consideration for time, labor, equipment, material and a Contractor's fee of 10%." *Id.* at 173. Such changes also required a written change order signed by both parties, and it was recognized they would result in modifications to the contract price and additions to the completion time for the Project.

In the event that DHC or the architect concluded that any of C&A's work did not conform to the contractual requirements, C&A was required to make the

necessary corrections to bring the work into compliance. But the Agreement also empowered DHC to withhold payment to remedy defective work; to satisfy claims or liens; to pay for unpaid labor, materials or equipment furnished to C&A; and to pay subcontractors for labor, materials, or equipment they furnished for the Project without proper payment from C&A. For its part, DHC agreed not to interfere with or impede the work of C&A's subcontractors.

DHC was authorized to terminate the Agreement if C&A:

1. persistently or repeatedly refuse[d] or fail[ed] to supply sufficient properly skilled workers or proper materials to maintain [the Project] on schedule[;]
2. fail[ed] to make payment to Subcontractors for materials or labor. . .[;]
3. persistently disregard[ed] the laws, ordinances, or rules, regulations, or orders of a public authority having jurisdiction; or
4. otherwise [was] guilty of a substantial breach of a provision of the Contract Documents.

*Id.* at 174.

## 2. Problems on the Project

The problems with the Project appear to have been deeply rooted. In fact, they seem to have arisen before construction work had even begun. For example, C&A has alleged that the plans for the Project were so poorly conceived that during construction, the condominiums began sliding down the mountainside and had to be anchored into place with gigantic metal piers at considerable additional cost and delay. But DHC attributes this need for stabilization to faulty

workmanship on C&A's part. DHC also claims that C&A failed, when negotiating the Agreement, to disclose its involvement in simultaneously constructing a competing condominium project. According to DHC, this conflict sapped C&A's ability and willingness to devote adequate resources to the Project once construction began.

Things went no better once construction actually began. The parties presented differing accounts of what went wrong on the Project. C&A alleged that "inadequate, incomplete, and inconsistent plans [for the Project] delayed the work and increased [its] construction costs." *Id.* at 141. It asserted that over time, DHC began failing to pay C&A's progress payment invoices and withheld portions of the required progress payments. Eventually, this allegedly made it impossible for C&A to pay its subcontractors.

DHC also allegedly interfered with C&A's work on the Project, improperly communicated with C&A's subcontractors, instructed the subcontractors to make changes to the Project without C&A's consent, and supervised their work in derogation of C&A's supervisory responsibilities. C&A asserts that DHC's principal, Steven Danko, requested additional work on the Project but refused to sign change orders reflecting this work, and refused to make payment to C&A for the extra work. DHC purportedly brought its own subcontractors to the Project to make changes and additions, which caused further interference and delays.

Finally, DHC's modifications allegedly caused delays on the Project and extended its completion date.

DHC told a very different story. It complained that a significant amount of C&A's work on the Project was defective, and that C&A refused to correct the defects. This required DHC to hire cover contractors to correct the work. DHC claimed C&A failed to employ an adequate number of workers on the Project. DHC also charges that C&A breached the Agreement by failing to complete the Project by the completion date specified in the Agreement.

DHC also contended that it made full progress payments to C&A as required, but that C&A diverted to itself moneys that were supposed to go to subcontractors. These unpaid subcontractors then filed liens on the Project, which DHC had to pay to remove. After repeated notices to C&A concerning these alleged deficiencies, DHC invoked its contractual right to terminate C&A, and completed the Project itself using another contractor.

### 3. DHC's Notice of Default; C&A's Mechanic's Lien

These problems culminated in DHC's issuance of a final notice of default to C&A on February 22, 2008. The notice specified several alleged deficiencies on C&A's part. C&A vigorously disputed each of the alleged deficiencies. The parties were unable to settle their differences, and on March 4, 2008, DHC terminated C&A from the Project. C&A recorded a mechanic's lien against the Project in the amount of $958,576.58.

### 4. Lawsuit and Claims

C&A filed this action in April 2008. In its amended complaint, C&A charged DHC with breaching the Agreement by contacting, supervising, and directing C&A's subcontractors; by impeding C&A's ability to perform under the Agreement; by failing to pay C&A amounts due under the Agreement; and by terminating the Agreement without adequate cause.[5] C&A requested damages in an amount no less than $1,202,923.15; additional damages including punitive damages to be proved at trial; foreclosure of its mechanic's lien valued at $958,576.60; a declaratory judgment that DHC improperly terminated C&A from the Project; and attorney's fees and costs.

DHC filed a counterclaim in which it charged C&A with breach of contract, relying on the deficiencies identified in its final notice of default.[6] DHC requested an award of damages in an amount to be proved at trial; damages

---

[5]    In addition to a breach-of-contract claim, C&A's complaint included claims for breach of the covenant of good faith and fair dealing, declaratory judgment relating to the termination of the Agreement, intentional interference with contractual relations, intentional interference with economic relations, injurious falsehood, and unjust enrichment/quasi-contract. In the event that the district court released the mechanic's lien, C&A included a claim against the alternate security in the form of moneys retained by Zions Bank.

[6]    DHC's additional claims against C&A included breach of the covenant of good faith and fair dealing, abuse of lien and wrongful lien, and unjust enrichment. DHC also cross-claimed against the Project's architect for breach of contract; that claim is not at issue in this appeal.

equivalent to twice the amount of the excessive portion of DHC's lien; treble damages for a wrongful lien; and attorney's fees, costs, and interest.

Both parties moved for partial summary judgment. They submitted many voluminous and conflicting exhibits in connection with these motions, including affidavits, draw requests, bills from contractors, signed waivers, correspondence, architect's inspection reports, photographs of the Project, and charts.

**5. DHC's Motion for Partial Summary Judgment**

DHC filed a motion seeking to reduce C&A's mechanic's lien by amounts DHC claimed C&A had unconditionally released. DHC argued that C&A had based $395,000 of its lien on three unsigned change orders, and that it had signed a payment waiver that barred any claim based on these change orders.

In ruling on DHC's motion, the district court made certain factual findings, which it characterized as uncontroverted, concerning the parties' dispute. It found that C&A started work on the Project on or before June 29, 2006 and that under the Agreement, C&A was to have completed the Project on or before January 25, 2007. (The district court did not, however, rule on whether this deadline had subsequently been extended by the parties through change orders.) In exchange for a progress payment of $310,427 and an overall payment of $5,075,525.95 from DHC, the court determined that C&A had waived its right to additional payment and/or a mechanic's lien for any labor, services, equipment, or materials furnished through December 10, 2007. The district court then addressed

each of the three challenged change orders, finding them illegitimate. It

concluded that C&A's amended mechanic's lien should be reduced by the sum of

$395,000, representing the three rejected change orders.

C&A subsequently moved for a revision of the district court's order

pursuant to Fed. R. Civ. P. 54(b). The district court denied this motion.[7]

**6. C&A's Motions for Partial Summary Judgment**

For its part, C&A filed two motions for partial summary judgment. Both

were apparently denied, though the record we have does not appear to contain an

explicit ruling on them. The first motion sought a ruling favorable to C&A on the

Project's completion date, the amount C&A had completed before its termination

from the Project, and the amount due from DHC on C&A's Draw Request No. 14.

In its response, DHC emphasized the *need for a trial* to resolve many of the

factual issues on which C&A sought summary judgment. With respect to the

completion date, DHC stated that "[t]he issue as to the effect change orders had

on the Project completion date is one of fact, and cannot, therefore, be resolved as

a matter of law." Aplt. App., Vol. 3 at 1005 (typeface altered). DHC noted that

"a triable issue of fact exists to what effect--if any--Section 12 [of the

Agreement] has on extensions of time not explicitly granted through the change

---

[7]     DHC apparently filed another motion for partial summary judgment on
January 30, 2010. This motion is not part of the record on appeal, but appears to
have been implicitly denied by or subsumed in the final judgment.

order process." *Id.* at 1006 (typeface altered). DHC concluded that a triable issue of fact remained both as to the start date for construction and the completion date for the Project.

DHC also stated that there were "triable issues of fact regarding what was required from C&A before a progress payment could be made" on Draw Request No. 14. *Id.* at 1014 (typeface altered). DHC argued, for example, that C&A's alleged unsatisfactory work on the Project affected the amount due under its draw requests, and that this created "genuine triable issues of fact that cannot be ruled on summary judgment with respect to rejected work." *Id.* at 1015 (typeface altered). In general, DHC argued that "[a] triable issue of fact exists with respect to the circumstances surrounding Draw 14." *Id.* at 1019 (typeface altered).

C&A's second partial summary judgment motion requested findings from the district court that DHC wrongfully terminated C&A from the Project, and wrongfully delayed the Project. C&A also asserted that DHC made direct payments to C&A's subcontractors of no less than $162,715.61, representing additional work requested by DHC without C&A's involvement or approval. C&A's subcontractors also allegedly did at least $64,000 of other work in connection with the structural modifications necessitated by the faulty plans, again without C&A's involvement.

C&A again claimed that more of the Project was complete than DHC gave it credit for. It argued that "[b]y DHC's own admission, C&A had completed no

less than 94% of its work at the Project as of January 8, 2008 (two months prior to C&A's termination)." *Id.*, Vol. 4 at 1248. C&A also again argued that DHC had authorized draw requests but C&A had not been paid in full for these requests. C&A claimed that this authorized but unpaid amount totaled $526,633.63.

In addition, C&A alleged that DHC had failed to pay it for at least $352,000 in extra work done by C&A or its subcontractors throughout the course of the Project. In support of this claim, it attached unsigned change orders, supporting documentation, and affidavits. C&A also asserted "substantial claims for overhead and supervision which C&A needed to perform at the Project as a result of various factors beyond C&A's control, and which entitled C&A to more than $400,000 in additional compensation from DHC." *Id.* at 1252. Finally, C&A complained that DHC had delayed approval and payment of change orders, to C&A's detriment.

### 7. The Final Pretrial Conference

The district court held a number of pretrial conferences at which the issues, including the appropriate amount of damages, were hashed out in detail. C&A has provided us with a transcript of the last of these conferences, which took place on February 23, 2011, less than a month before a scheduled 14-day jury trial. This conference featured a remarkable number of often-confusing damage estimates from both parties, many of them based on disputed facts and competing

methodologies. We discuss these estimates in some detail, to show how inchoate matters proved to be at this stage of the proceedings.

At the outset of this conference, the district court asked C&A's counsel to "examine with me what's left and tell me your justification for each of [your] assertions . . . as to what remains in the way of monetary damages for the alleged breach of contract." *Id.*, Vol. 6 at 1963. Counsel indicated that he had performed a great deal of work attempting to narrow the evidence that supported C&A's claims. An exact figure, however, remained elusive.

Based on the architect's certification of completion, counsel indicated, C&A's "contract claim" amounted to "no less than $526,000 as of February 6th, [2008]." *Id.* at 1964. When asked to provide a further breakdown of the basis for C&A's claim, counsel stated that somewhere between $800,000 and $900,000 remained due under the Agreement. He admitted that DHC had made direct payments to subcontractors of approximately $200,000, "depending on what transpires at trial," which ought to be subtracted from the amount due. *Id.* at 1965. This left a contract claim of approximately $687,000.

C&A's counsel then moved on to C&A's "largest claim," for delay damages. *Id.* at 1969. He asserted that C&A was due $2,500 for each day construction was delayed by DHC, covering its expenses for "supervision, insurance, temporary utilities, equipment, cleanup, safety, subsistence, [and] dust control." *Id.* at 1969-70. This amount, in counsel's estimation, totaled $962,000.

-14-

Counsel added this figure to its "500,000-plus . . . base claim," and arrived at total damages in excess of $1.5 million. *Id.* at 1972. Counsel admitted, however, that he did not have a breakdown showing that C&A had actually paid out an additional $962,000; instead, this was a pro rata extrapolation from C&A's costs allocated under the Agreement, based on the anticipated 210-day span of completion.

The district court questioned C&A's $200,000 estimated value for DHC's offset for direct payments to subcontractors. It noted that DHC had supplied receipts showing payment far in excess of $200,000. C&A's counsel stated that it would be "[v]ery, very difficult . . . without a trial" to figure out how much of DHC's figures could actually be offset, because the amounts paid to these subcontractors came from three "buckets": "work within the scope of C&A's contract," "work on customizing units," and "work in . . . doing the structural repairs." *Id.* at 1977-78. Counsel opined that there would be "a very significant challenge at trial to be able to ferret out which bucket" DHC's claimed expenses belonged to, and whether an offset was appropriate. *Id.*

The district court turned to DHC for its damage estimates. DHC's counsel noted that there were liens filed on the Project in the amount of $642,000. DHC negotiated with the subcontractors who had filed the liens, such that it actually paid $538,290 to settle these lien claims. DHC's counsel asserted (contrary to C&A's counsel's argument) that these payments were solely paid for "amounts

-15-

that were due and owing C&A on their agreements with the subcontractors." *Id.* at 1991.

DHC had also paid $110,000 on Draw Request 14, for a total of $648,290. This amount was paid in addition to $5.1 million DHC paid on the other draw requests, plus an additional $67,000 payment that DHC said it could document, totaling $5,815,290 DHC paid out under the Agreement. Dividing that amount by a total estimated contract amount under the Agreement of $6 million, DHC calculated it had paid 96.9215 percent of the contract amount. Looked at another way, DHC calculated that it had paid all but $184,710 of the contract price.

In addition, DHC claimed it spent $262,000 to repair defective work on the Project, and $600,000 to complete the Project. In support of the $600,000 figure, Mr. Danko provided an itemized list of amounts DHC paid to various contractors, which actually came to $547,732.82. The itemized repair costs came to $260,388.50. Mr. Danko also indicated that the subcontractors were "willing and able to appear and testify as to the work that they did, the repairs that were made, the validity of their invoices, [and] the fact that they received payment from me for that work." *Id.* at 1997. He calculated the cost overrun on the Project at $660,924.

Mr. Danko then made an extended *pro se* argument concerning the legal and factual basis for DHC's damages. He claimed that C&A had not produced the proper lien releases to be paid for Draw Request No. 14. He argued that C&A

-16-

had failed to provide invoices accounting for where the funds paid by DHC had been spent. He contended that C&A was not entitled to damages for delay, because (1) it was C&A who had delayed the Project, illustrated by C&A's agreement to pay his interest expense for two months through a deductive change order; and (2) C&A had failed to substantiate its alleged damages resulting from the delay.

Mr. Danko, though apparently not sworn as a witness, also made many factual representations during the course of his argument concerning such matters as what C&A and DHC had paid for on the Project and why C&A had allegedly failed to perform its obligations under the Agreement. C&A's counsel responded by noting the "very big difference between what the plaintiffs argue and the defendants argue." *Id.* at 2016. Counsel contended that in assessing DHC's completion costs, the district court should rely on the architect's certification showing 94 percent completion. Counsel further argued that the district court should not credit DHC with repairs for inadequate work because the architect had certified that the work had been properly performed. Additionally, counsel argued that DHC had failed to give C&A 30 days' notice of any defective work, as required by the Agreement.

Stating that it intended to "address problems today" and "simplify as much as we can today and rule as much as we can today," the district court asked C&A's counsel whether C&A disputed the *amounts* DHC claimed it had expended

-17-

to complete the Project. *Id.* at 2027. Counsel responded that he did not dispute the alleged payments, but contended that questions remained concerning whether the work fell "within the allowance categories of C&A's scope of work." *Id.* at 2028. Counsel repeated C&A's estimate that only $200,000 of the work DHC performed was a proper offset.

The district court demanded specific evidence to support this figure, insisting (as it did on numerous occasions during the conference) that C&A must bring forth its evidence before trial. C&A acknowledged the request, and again noted the architect's certification that two months before termination only $391,000 was left to finish the Project, and it was 97 percent complete. C&A then stated that its best estimate of its damages was $707,000, which represented the remainder due under the contract plus the value of signed change orders for which C&A had not yet been paid.[8] C&A also argued that the jury could determine that DHC was entitled to *no* offset, because DHC wrongfully terminated the Agreement, or because it interfered with the Agreement by directly settling lien claims with C&A's subcontractors.

The district court then turned again to C&A's "delay damage" claim. C&A repeated its assertion that its claim for $2,500 per day totaled $960,000. The district court then asked "[w]hich theory are you going to use?" *Id.* at 2053.

---

[8]     C&A later offered two different figures: $526,000 if the Project were 94 percent at the time of termination, and $707,000 if it were 97 percent complete.

-18-

Counsel responded that C&A's theories were complimentary, not exclusive. The district court disagreed; it replied that they were inconsistent and that C&A would have to choose one theory or the other.

Mr. Danko presented additional spreadsheets and unsworn testimony concerning the payments DHC had made to settle lien claims on the Project. He also presented information about written change orders on the Project and his calculation of days and amounts added to the contract by virtue of these change orders. Upon further questioning from the district court, he specified that DHC's out-of-pocket expenses for completing the Project totaled $800,000, representing $262,000 for repairs and about $547,000 for completing the contract. DHC's counsel presented a final figure due from C&A of $660,924, but stated "that obviously doesn't count a lot of other theories that we want to bring forward that we also have evidence for and can prove at trial." *Id.* at 2076.

After a bit more argument from each of the parties, the district court announced the following conclusions:

> Giving plaintiffs full credence for their newly-minted damage assertion, namely, $2,500 a day, amounting to some $900,000, which contrasts with the prior damage calculation previously asserted in the court – to the Court of . . . roughly [$]570,000, or if we take the fixed amount percentage that remains to be finished, namely, $320,000.
>
> But looking at the out-of-pocket on the part of the defendants over a period of time and crediting it against . . . the . . . somewhat spurious amount of $900,000, but even giving them full credit for

-19-

that as an offset . . . that leaves a balance due and owing from plaintiff to defendant of $442,000.

*Id.* at 2090-91. The district court instructed DHC's counsel to craft proposed findings, conclusions, and a judgment in favor of DHC.

### 8. C&A's Objections to DHC's Proposed Order

The district court later held a hearing on C&A's objections to DHC's proposed order. During this hearing, C&A's counsel objected generally to what it viewed as an improper use of summary judgment procedures in the order after "this Court had previously taken the position that all motions for summary judgment if not expressly granted had been denied categorically and trial had been set." Aplee. Supp. App. at 21. He added that "[o]ne very important objection that the plaintiffs have is that there was not proper notice given to the plaintiffs." *Id.*

The district court rejected this argument. It stated that it had conducted the final pretrial conference pursuant to Fed. R. Civ. P. 16 in an effort "to simplify issues, to ascertain if there are genuine issues that are capable of being tried, that are genuinely in dispute, if there is a rational footing for the assertions that counsel has made." Aplee. Supp. App. at 21.

Counsel responded that its own motion for partial summary judgment had demonstrated issues of fact for trial. The district court disagreed; it responded that its "Socratic give-and-take" caused the "situation . . . to shake down" to the

parties' "best theory," based on counsel's representations at the pretrial conference.  *Id.* at 22-23.  Counsel objected that this "best theory" analysis "ignore[d] the comprehensive evidence in support of [C&A's] claims in excess of 1.5 million."  *Id.*  He argued that

> the succinct and comprehensive evidence presented in not one full briefing [binder] that I'm holding, a four-inch binder, but multiple binders to which at least this one not being responded to by opposing counsel, except as in the form of a motion to strike [for untimeliness], at least requires *consideration of the jury trial that defendants demanded.*

*Id.* at 25 (emphasis added).

C&A's counsel then pleaded for more time to establish its entitlement to the full $1.5 million value of its claim.  He requested the opportunity to present testimony, just as Mr. Danko had "testified" for DHC.  The district court stated: "I am not going to listen to witnesses.  I am going to listen to counsel."  *Id.* at 28.  It ruled that only the "form and content of the proposed order," rather than any consideration about the fairness of the pretrial conference procedure, would be the subject of the hearing.  *Id.*

Counsel again objected that genuine issues remained for trial concerning the purpose for which DHC paid subcontractors on the Project.  *Id.* at 34-38.  The district court noted the lack of specific, countervailing evidence from C&A on this point.  Counsel responded that the district court was merely relying on DHC's summary conclusion on how much had been paid and that outstanding issues

remained concerning "whether that is the responsibility of C&A" and whether "that payment to the sub where, by their own admission, those subs were doing work outside the scope" of the Agreement. *Id.* at 39. Counsel further argued that there was evidence of record that DHC had stipulated that only $391,000 was left to finish the Project, but that DHC stated that it spent considerably more than that amount to complete the Project.

Finally, at the end of the hearing, C&A's counsel offered to present testimony from its project manager and the superintendent on the Project concerning the damages issues. The district court responded that the only relevant record was that which existed at the time of the final pretrial conference "with not anything added to it, and that is what we were dealing with." *Id.* at 53. It rejected counsel's request.

### 9. District Court's Final Order

In its final order, the district court found that C&A had essentially advanced three theories to support its recovery of damages in this case: (1) a contractual nonpayment theory, which included claims that C&A was underpaid on numerous draw requests and not paid at all on three of its draw requests, leaving a balance due of more than $526,000; (2) a "delay" theory under which C&A claimed more than $900,000 based on damages incident to delays caused by DHC; and (3) an "extra work" theory under which C&A performed more than $300,000 in extra work for which DHC never made payment. In addition, the

-22-

district court noted C&A's mechanic's lien for $958,000, previously reduced to $352,954. The district court treated these three theories as mutually exclusive. C&A disputes this characterization.

The largest of these three claims was C&A's "delay" claim. The district court credited C&A with the full $962,000 of damages asserted under its "delay" theory. It then offset this amount against DHC's entire claimed out-of-pocket payments for repairing and finishing the Project, which it estimated at $1,347,290. The district court adopted this $1.347 million offset even though C&A contended that the legitimate portion of the offset amounted to a much smaller figure.[9] The district court also found (notwithstanding C&A's factual dispute concerning this issue) that "C&A's non-payment of subcontractors and suppliers represented a material breach of the Contract." Aplt. App., Vol. 6 at 2101. It further found that "C&A failed to dispute with any particularity any of the out-of-pocket expenditures claimed by DHC, or to point to any significant probative evidence discrediting the evidentiary support proffered in support of DHC's claims." *Id.*

The district court's calculation left a balance in favor of DHC against C&A of $385,290. It then entered judgment in this amount for DHC, and also released

---

[9]     The district court arrived at this figure by adding together "DHC's claim for the $538,290 paid to subcontractors . . . [its] claims for the subsequent completion of work ($547,000) and repair of defective work ($262,000) on the project[.]" Aplt. App., Vol. 6 at 2101.

to DHC all remaining alternate security funds currently on deposit with Zions Bank. In addition, it awarded DHC $328,924.57 in attorney's fees against C&A.

## ANALYSIS

### 1. DHC's Motion to Dismiss Appeal

DHC has moved to dismiss this appeal on jurisdictional grounds. It theorizes that "*no* plaintiff/appellant party currently has standing to appeal the judgment entered against it." Mot. to Dismiss, at 4 (emphasis added). This assertion stems from a spate of complicated procedural maneuvering that occurred while the case was pending in district court.

About a year after C&A filed its complaint, a drywall contractor obtained judgment against C&A. To satisfy C&A's debt, the contractor scheduled a "sale" of C&A's claims in this case against DHC. Before this sale could take place, however, the contractor, C&A, and other parties including Professional Investment Advisors, LLC (PIA) entered into a settlement agreement by which the sheriff's sale was cancelled. As part of this agreement, C&A transferred its claims against DHC to PIA.

PIA then formed the Black Diamond Construction Trust ("Black Diamond"), a named plaintiff/appellant in this appeal. PIA assigned C&A's claims against DHC to Black Diamond. A few months later, C&A filed Chapter 7 bankruptcy.

-24-

Black Diamond paid C&A's Chapter 7 trustee $15,000 to settle the trustee's claim that the transfer to Black Diamond represented a fraudulent conveyance that could be avoided in bankruptcy. The trustee then executed a certification that the bankruptcy estate had reserved no rights with respect to the claims C&A asserts in this action. The bankruptcy court approved the settlement between the C&A bankruptcy estate and Black Diamond. Also, DHC sought and obtained relief from the automatic stay in bankruptcy under 11 U.S.C. § 362(a) to pursue its claims against C&A.

C&A moved to substitute Black Diamond as a party. But Black Diamond in turn conveyed C&A's chose-in-action to another trust, plaintiff/appellant Black Diamond Construction 1 Business Trust ("BDCBT"). C&A then filed an amended motion to substitute BDCBT as plaintiff.

In its final order, the district court concluded that BDCBT was the real party in interest. It joined the trustee of Black Diamond and BDCBT as plaintiffs and entered judgment against them as well as C&A. In response to DHC's post-judgment interrogatories, both Black Diamond and BDCBT stated that they have no assets other than the claims C&A assigned to them against DHC, and that they do not intend to fund the trusts with additional assets from which to satisfy DHC's judgment.

The appellants, as the parties seeking to invoke federal jurisdiction, bear the burden of establishing their standing to appeal. *Lujan v. Defenders of*

-25-

*Wildlife*, 504 U.S. 555, 561 (1992).  The standing required by Article III of the Constitution "must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance."  *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997).

> To establish Article III standing, a plaintiff must demonstrate that he has satisfied each of three 'irreducible constitutional' elements. Specifically, the plaintiff must show that:  (1) he has suffered an "injury in fact"; (2) the injury is "fairly traceable" to the complained-of conduct; and (3) it is "likely as opposed to merely speculative that the injury will be redressed by a favorable decision."

*Turner v. McGee*, 681 F.3d 1215, 1218 (10th Cir. 2012) (citation omitted) (quoting *Lujan*, 504 U.S. at 560-61).  DHC contends that each of the appellants have failed to meet the third criterion for standing.

DHC first argues that C&A lacks standing because "C&A has transferred its claims against DHC in this matter and therefore has no redress from any appeal."  Mot. to Dismiss, at 7.  We agree with DHC that C&A does not have a stake in affirmatively recovering on its claims against DHC because C&A's right to such recovery has been transferred to the trusts.  The real question is whether C&A has a stake in seeking to *vacate or reduce* the judgment against it.

We conclude this question must also be answered in the negative.  It has long been recognized in the context of appellate review of bankruptcy court orders that "a hopelessly insolvent debtor does not have standing to appeal orders affecting the size of the estate, since such an order would not diminish the

-26-

debtor's property, increase his burdens, or detrimentally affect his rights."

*C.W. Mining Co. v. Aquila, Inc. (In re C.W. Mining Co.)*, 636 F.3d 1257, 1260

(10th Cir. 2011) (quoting *In re El San Juan Hotel*, 809 F.2d 151, 154-55

(1st Cir. 1987)).  While this principle applies to prudential standing in bankruptcy

proceedings, *see C.W. Mining Co.*, 636 F.3d at 1260 n.5, we detect similar

concerns regarding C&A's Article III standing here.

DHC has presented evidence that C&A is involved in Chapter 7 liquidation

proceedings and that its assets, estimated at $500,000 to $1 million, are greatly

overwhelmed by its estimated liabilities of $10 million to $50 million.  *See* Aplee.

Supp. App. at 151.  C&A fails to show that success in its appeal against DHC,

even if it could potentially reduce the amount C&A owes to DHC, would generate

any assets for C&A, make C&A solvent, or permit any additional distribution to

C&A.  This being the case, C&A has failed to meet its burden of demonstrating

any injury to its pecuniary interests that would be redressed by a judgment in its

favor in this appeal.  In sum, C&A has not met its burden to establish its standing

to appeal, and must be dismissed as a party.

DHC next argues that Black Diamond lacks standing because it has

transferred the claims it received from C&A to BDCBT.  DHC also asserts that

Black Diamond is a non-entity because it has no other assets besides those it

conveyed to BDCBT, and thus lacks a trust res that would make it a valid ongoing

trust under Utah law.  In their response brief, appellants' counsel make no attempt

-27-

to support Black Diamond's standing. Black Diamond has therefore failed to meet its burden to show it has standing to pursue this appeal. Its appeal will be dismissed.

Finally, DHC argues that BDCBT lacks standing because it has no assets with which to pay the judgment entered against it. This ignores the potential effect of BDCBT's appellate claims. Assuming BDCBT is successful on both its appellate claims seeking to reduce or invalidate DHC's recovery, and appellate claims seeking to augment BDCBT's recovery, BDCBT may potentially be entitled to an affirmative recovery from DHC. Thus, DHC's argument lacks merit, and BDCBT has standing.

## 2. District Court's Final Judgment

We now turn to the merits. C&A raises several challenges to the district court's final judgment order.[10] Before even considering these arguments, we must first attempt to determine the nature of the district court's challenged disposition.

C&A requested a jury trial in its complaint. The Seventh Amendment guarantees a jury trial "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars." The district court could only deprive C&A of its requested trial by jury with C&A's consent, or by following appropriate procedures for a summary disposition.

---

[10]    We continue to refer to appellants as "C&A," though we have demonstrated that only BDCBT has standing to prosecute this appeal.

## A. Did the District Court Correctly Enter Summary Judgment?

The Seventh Amendment guarantee does not prevent a federal district court from granting summary judgment, where appropriate. *See Shannon v. Graves*, 257 F.3d 1164, 1167 (10th Cir. 2001) ("The Seventh Amendment is not violated by proper entry of summary judgment, because such a ruling means that no triable issue exists to be submitted to a jury."). At various points in the proceedings, both parties filed motions for partial summary judgment. But it does not appear that a motion for summary judgment concerning the entire controversy was pending at the time of the pretrial conference. If the district court entered a summary-judgment order, it was thus entered at least in part sua sponte.

We do not believe, however, that the district court's final order can be viewed or reviewed as a sua sponte order granting summary judgment. The order never purported to enter summary judgment. No summary-judgment standard of review was stated in it. Rule 56 of the Rules of Civil Procedure, governing summary-judgment dispositions, was not cited. The order failed to make any findings of fact or conclusions of law that would have been appropriate for a summary-judgment disposition. *See* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court

should state on the record the reasons for granting or denying the motion.").[11]

Finally, during the motion hearing on DHC's proposed order, the district court appears to have implicitly disavowed an intention to enter a summary-judgment disposition. *See* Aplee. Supp. App. at 21.

### B. Was the District Court's Order Valid Under Rule 16?

We next consider DHC's position that the district court's order was valid and justified under Federal Rule of Civil Procedure 16. Rule 16 permits the district court to order parties to appear at a pretrial conference "for such purposes as:

(1) expediting disposition of the action;

(2) establishing early and continuing control so that the case will not be protracted because of lack of management;

---

[11]    In the final order, the district court did note its previous oral conclusion, stated during the pretrial conference, that "there had been a complete failure of the evidence pointed to by C&A to raise triable issues of fact concerning C&A's claims and DHC's counterclaims." Aplt. App., Vol. 6 at 2101. But we do not view this statement as a summary judgment finding. For one thing, it focused only on what C&A "pointed to" at the hearing, not the record as a whole. For another, it was immediately followed by the district court's allowance of $962,000 to C&A for its delay claim; an odd concession if there were *no* evidence to support C&A's claims. Further, in the order, the district court did not adopt this statement about what it had previously said as a summary-judgment finding.

Moreover, the district court's actual statement at the pretrial conference, cited in the order, was much more equivocal than that reflected in the order. What the district court actually said was: "It seems to me that there is enough agreement among the accountings that we've received to legitimately find that there is a failure of evidence on the part of plaintiff." Aplee. Supp. App. at 137. Again, this falls far short of a definitive summary-judgment finding of "complete failure of the evidence" on all claims and counterclaims.

-30-

(3) discouraging wasteful pretrial activities;

(4) improving the quality of the trial through more thorough preparation; and

(5) facilitating settlement.

Fed. R. Civ. P. 16(a).

There are limits, however, to what can be accomplished at a pretrial conference, particularly without consent of the parties. Such a conference can certainly culminate in the consensual settlement of all of the parties' claims. *See* Fed. R. Civ. P. 16(c)(2)(I); *cf. Rhea v. Massey-Ferguson, Inc.*, 767 F.2d 266, 268 (6th Cir. 1985) (rejecting Seventh Amendment challenge to rule permitting referral to pre-trial mediation because a jury remained ultimately responsible for determining facts unless "*settled by the parties* or determined as a matter of law" (emphasis added) (internal quotation marks omitted)). Or, as DHC notes, the district court can use a Rule 16 conference to weed out *frivolous* claims or to simplify *the issues for trial*. *See id.* Rule 16(c)(2)(A). But the district court's disposition in this case went beyond these permissible actions. Here, the district court essentially held a mini-trial at which only the attorneys and Mr. Danko "testified." It then resolved highly-contentious factual issues and disputes, in some cases relying on hypothetical assumptions, estimated figures, and disputed methodology, and entered a judgment resolving the entire case, including the amount of damages, over C&A's strenuous objections.

This case thus resembles the Eleventh Circuit case of *Williams v. Georgia Department of Human Resources*, 789 F.2d 881 (11th Cir. 1986). There, the plaintiff filed a civil rights complaint against a physician who treated her in prison and various state entities, seeking damages for injuries she allegedly suffered during and after childbirth. She requested a jury trial. During a Rule 16 pretrial conference, the defendants' attorney requested leave to move for summary judgment. In response, the district court judge "stated that he wanted the parties to submit to him all the evidence that they would put on at trial if a trial were held." *Id.* at 882. Based on this presentation, the judge would decide whether the case would go to a jury.

Plaintiff's counsel objected that the defendants should be required to follow traditional summary-judgment procedures, and if summary judgment were not granted, plaintiff should receive a jury trial. Counsel nevertheless reluctantly went along with the district court's proposed procedure. Both sides submitted affidavits, depositions, medical records, and briefs to the court. After considering these materials, the district court entered an order granting a "directed verdict" against the plaintiff.

The Eleventh Circuit reversed, stating:

This Court [has previously] held that Rule 16 does not confer special powers to enter judgment not authorized by Rule 56 or the other rules. [*Fid. & Deposit Co. of Md. v. So. Util., Inc.*,] 726 F.2d [692,] 693 ([11th Cir. 1984)]. . .

On the basis of *Fidelity & Deposit Co. of Md.*, we conclude that the district court erred in granting a "directed verdict" in favor of defendants. Where a party in a civil case has requested a trial, the district court has no power to grant a "directed verdict" prior to trial.

The district court may of course entertain a motion for summary judgment, provided that the court strictly adheres to the procedures required under Rule 56. *Id.* at 693 n.2.

*Williams*, 789 F.2d at 883.

Obviously, a district court may use a pretrial conference to narrow issues and "facilitat[e] in other ways the just, speedy, and inexpensive disposition of the action." Fed. R. Civ. P. 16(c)(2)(P). Here, however, as in *Williams*, the district court went beyond this power and essentially directed a pretrial verdict in favor of one party, DHC, even establishing the amount of damages to be awarded on disputed claims without complying with the appropriate summary-judgment procedures. In doing so, it exceeded its powers under the Rule.

### C. May the District Court's Order be Affirmed on Alternative Grounds?

As we have stated on many occasions, we may affirm the district court's disposition on an alternative ground if "there is a record sufficient to permit conclusions of law." *Ashby v. McKenna*, 331 F.3d 1148, 1151 (10th Cir. 2003). But the district court's award here cannot be sustained on this record under a summary-judgment rationale, particularly where the award was based on estimated figures and the damage issue was hotly disputed by the parties. As another court stated in similar circumstances:

-33-

The parties debate the merits of their respective positions and the defects in the opposing party's arguments. All to no avail. We do not know the facts. While the district court has given some reasons for its actions, there has never been a trial on the merits. The complaint states a claim. The opinion does not even purport to dismiss the suit for failure to do so. The facts are disputed. The opinion does not even purport to render a summary judgment on the basis that there is no genuine dispute of material fact. The plaintiffs demanded trial by jury in accordance with Federal Rule of Civil Procedure 38 and the seventh amendment. No reason has been given why they are not entitled to such a trial. . . . [T]he defendants characterize the district court's summary dismissal as proper under the pretrial conference procedure of Federal Rule of Civil Procedure 16. In this case, however, the plaintiffs were not afforded the opportunity to develop all of their factual and legal support.

*Simon v. City of Clute, Tex.*, 825 F.2d 940, 942-43 (5th Cir. 1987) (footnotes omitted).

### 3. Partial Summary Judgment Order

This brings us to the other challenged order in this appeal, the district court's order of partial summary judgment. C&A urges us to reverse the order, which barred its claims that accrued prior to December 10, 2007. DHC contends that C&A's waiver of payment of claims prior to that date was valid and should be enforced.

The district court's judgment was technically final, and we therefore have jurisdiction over the entire appeal, including that portion that seeks review of the interlocutory partial summary judgment order. *See Sines v. Wilner*, 609 F.3d 1070, 1075 (10th Cir. 2010) ("An appeal from a final judgment usually draws into question all prior non final orders and all rulings which produced the judgement."

-34-

(internal quotation marks omitted)). We thus have subject-matter jurisdiction to reach an appellate disposition of the challenged partial summary judgment order, even though we must vacate the final judgment.

Under the unique circumstances of this case, however, we decline to pass judgment on the correctness of the district court's interlocutory partial summary judgment order. Such a disposition on our part would likely bind the district court under the "law of the case" doctrine. *See Richardson ex rel. Richardson v. Navistar Int'l Transp. Corp.*, 231 F.3d 740, 743 (10th Cir. 2000) (under law of the case doctrine, courts will not reconsider a matter resolved in a prior appeal). But the issue of whether C&A's alleged waiver should be given effect concerns something other than a discrete claim or claims that can be severed from the action as a whole; instead, the issue appears to be intertwined with the overall merits of the case. The district court should therefore remain free to revisit its interlocutory conclusions, if necessary, at any time prior to entering final judgment. *See* Fed. R. Civ. P. 54(b) ("[A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."). In sum, given the unusual procedural posture of this case, we decline to cement the district court's interlocutory order permanently in place with appellate adhesive.

## 4. Issues Involving the Record on Appeal

C&A has filed a motion requesting us to declare that "it was appropriate for C&A to include its proposed witness and exhibit lists in the appendix to its opening brief and to include its March 3, 2010 letter to the district court in a supplemental addendum to its opening brief." Mot. at 2. DHC opposes the motion. Because consideration of these materials was not required to reach our disposition of this case, this motion is denied as moot.

DHC also responds with a general objection to C&A's appendix. It complains that C&A did not give it adequate notice of the contents of the appendix before it was filed; that DHC only received a copy of the appendix three days after C&A's opening brief was filed; and that the appendix contains irrelevant material, and "needs to be pared down." Resp. to Mot. at 7.

We find no basis in DHC's arguments for striking any part of C&A's appendix. DHC fails to show prejudice from any of the complained-of conduct. Notwithstanding DHC's complaint about the length of the materials submitted by C&A, we note that DHC filed a supplemental appendix containing an additional 284 pages of material for our review.

## CONCLUSION

The judgment of the district court is VACATED, as is its order awarding attorney's fees, and the case is REMANDED for further proceedings before the district court. Daniel Bird, as Trustee of the Black Diamond Construction Trust,

and C&A Construction Company are DISMISSED as a parties to this appeal for lack of standing. This court DECLINES TO RULE on the appellate issues raised pertaining to the district court's interlocutory order of partial summary judgment. The pending motions and objections relating to the record on appeal are DENIED.

Entered for the Court


Wade Brorby
Senior Circuit Judge